Michael W. Sobol (SBN 194857)
msobol@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000

Steven W. Teppler (*pro hac vice*)
steppler@abbottlawpa.com
ABBOTT LAW GROUP, P.A.
2929 Plummer Cove Road
Jacksonville, FL  32223
Telephone: 904.292.1111

Joseph J. Siprut (*pro hac vice*)
jsiprut@siprut.com
SIPRUT, PC
17 North State Street, Suite 1600
Chicago, IL  60602
Telephone:  312.236.0000

Ariana J. Tadler (*pro hac vice*)
atadler@milberg.com
MILBERG LLP
One Pennsylvania Plaza, 49th Floor
New York, NY  10119
Telephone:  212.946.9453

Mark S. Goldman (*pro hac vice*)
goldman@lawgsp.com
GOLDMAN SCARLATO & PENNY, P.C.
Eight Tower Bridge
161 Washington Street, Suite 1025
Conshohocken, PA  19428
Telephone:  484.342.0700

*Attorneys for Plaintiffs and the Proposed Class*
*Additional Counsel listed on Signature Page*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE INTUIT DATA LITIGATION | Case No.  15-CV-1778-EJD-PSG |
| THIS DOCUMENT RELATES TO:<br><br>**ALL ACTIONS** | **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION TO COMPEL PLAINTIFFS KNOCH, LEBINSKI, SIEGEL, STOCK, AND WILLIAMS TO ARBITRATION AND TO STAY THEIR PROCEEDINGS**<br><br>**CLASS ACTION**<br><br>Date:  May 12, 2016<br>Time: 9:00 a.m.<br>Honorable Edward J. Davila |

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................................................................1

RELEVANT BACKGROUND ...........................................................................................3

ARGUMENT ......................................................................................................................6

    A.    The Court Properly Decides Arbitrability............................................................. 6

        1.    There is No Clear and Unmistakable Delegation Here. .............................. 7

        2.    The Court Can and Should, Itself, Deny Arbitration in All Events
            Because Intuit's Arbitration Argument is Wholly Groundless. ................. 12

    B.    The Customer Plaintiffs' Claims Fall Well Beyond the Scope of Any
        Arbitration Agreement They Have With Intuit. ...................................................... 14

        1.    The Customer Plaintiffs' Claims Are Unrelated to Their Actual
            Dealings With Intuit and Are Thus Outside the Substantive Scope
            of Any Arbitration Agreement They Have With Intuit............................. 15

        2.    The Customer Plaintiffs' Claims Are Also Outside the Temporal Scope
            of Any Arbitration Agreement They Have With Intuit............................. 17

        3.    Only the Court Can Hear the Customer Plaintiffs' Claims Seeking
            "Injunctions or Other Forms of Equitable Relief." .................................. 20

        4.    Intuit's Arbitration Provision is Unconscionable..................................... 21

            a.   Intuit's Contract of Adhesion is Procedurally Unconscionable........... 21

            b.   Intuit's Arbitration Provision is Substantively Unconscionable.......... 22

    C.    Even if Any of the Customer Plaintiffs' Claims Were Compelled to
        Arbitration, Their Remaining Claims Should Not Be Stayed................................ 22

CONCLUSION...................................................................................................................23

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Antonelli v. Finish Line, Inc.*,
5
 No. 5:11-cv-03874 EJD, 2012 U.S. Dist. LEXIS 19787
 (N.D. Cal. Feb. 16, 2012)......................................................................................22
6

*Aral v. Earthlink, Inc.*,
7
 35 Cal. Rptr. 3d 229 (Ct. App. 2005)...................................................................21

8
*Armendariz v. Found. Health Psychcare Servs., Inc.*,
 6 P.3d 669 (Cal. 2000) ...........................................................................................22
9

10
*ASUS Computer Int'l v. InterDigital, Inc.*,
 No. 15-cv-01716-BLF, 2015 U.S. Dist. LEXIS 118794 (N.D. Cal. Aug. 25,
11
 2015) ......................................................................................................................14

12
*AT&T Techs. V. Commc'ns Workers of Am.*,
 475 U.S. 643 (1986)................................................................................7, 13, 15, 17
13

14
*Aviles v. Quik Pick Express, LLC*
 No. CV-15-5214-MWF (AGR), 2015 U.S. Dist. LEXIS 174960
15
 (C.D. Cal. Dec. 3, 2015) ...............................................................................8, 9, 10

16
*Brennan v. Opus Bank*
 796 F.3d 1125 (9th Cir. 2015)..................................................................................8
17

18
*Clark v. Bear Stearns & Co.*,
 966 F.2d 1318 (9th Cir. 1992)................................................................................23

19
*Comer v. Micor, Inc.*,
20
 436 F.3d 1098 (9th Cir. 2006)................................................................................16

21
*Dean Witter Reynolds, Inc. v. Byrd*,
 470 U.S. 213 (1985)................................................................................................23
22

23
*Douglas v. Regions Bank*,
 757 F.3d 460 (5th Cir. 2014)..................................................................................13

24
*Dream Theater, Inc. v. Dream Theater*,
25
 21 Cal. Rptr. 3d 322 (Ct. App. 2004)....................................................................13

26
*Elite Logistics Corp. v. Hanjin Shipping Co.*,
 589 F. App'x 817 (9th Cir. 2014) ..........................................................................21

27
*Ellsworth v. United States Bank, N.A.*,
28
 No. C 12-02506 LB, 2012 U.S. Dist. LEXIS 134252 (N.D. Cal. Sep. 19, 2012)...........7, 12, 14

*Ferranti v. Hewlett-Packard Co.*,
   No. 5:13-cv-03847-EJD, 2015 U.S. Dist. LEXIS 121598
   (N.D. Cal. Sept. 10, 2015)...................................................................................21

*Fimby-Christensen v. 24 Hour Fitness USA, Inc.*,
   No. 5:13-cv-01007-EJD, 2013 U.S. Dist. LEXIS 166647
   (N.D. Cal. Nov. 22, 2013)...................................................................................21

*First Options of Chicago v. Kaplan*,
   514 U.S. 938 (1995).............................................................................7, 12, 15

*Gerton v. Fortiss, LLC*,
   No. 15-cv-04805-TEH, 2016 U.S. Dist. LEXIS 19297
   (N.D. Cal. Feb. 16, 2016)...................................................................................22

*Global Live Events - In Liquidation v. Ja-Tail Enters., LLC*,
   No. CV 13-8293 SVW, 2014 U.S. Dist. LEXIS 63963 (C.D. Cal. May 8, 2014)...................23

*Howsam v. Dean Witter Reynolds, Inc.*,
   537 U.S. 79 (2002).............................................................................................15

*Int'l Ambassador Programs, Inc. v. Archexpo*,
   68 F.3d 337 (9th Cir. 1995)..............................................................................20

*Interdigital Commc'ns, LLC v. ITC*,
   718 F.3d 1336 (Fed. Cir. 2013).........................................................................13

*John Wiley & Sons, Inc. v. Livingston*,
   376 U.S. 543 (1964)...........................................................................................15

*Korea Supply Co. v. Lockheed Martin Corp.*,
   63 P.3d 937 (Cal. 2003).....................................................................................21

*Koyoc v. Progress Fin. Co.*,
   No. CV 13-09165-RSWL, 2014 U.S. Dist. LEXIS 65229
   (C.D. Cal. May 9, 2014).....................................................................................16

*Long v. Fid. Water Sys. Inc.*,
   NO. C-97-20118 RMW, 2000 U.S. Dist. LEXIS 7827
   (N.D. Cal. May 24, 2000) ..................................................................................19

*Meadows v. Dickey's Barbecue Rests., Inc.*,
   No. 15-cv-02139-JST, 2015 U.S. Dist. LEXIS 153385
   (N.D. Cal. Nov. 12, 2015)..........................................................................7, 9, 10

*Mohamed v. Uber Techs., Inc.*,
   109 F. Supp. 3d 1185, 1199 (N.D. Cal. 2015) ....................................................7

*Morse v. Servicemaster Global Holdings, Inc.*,
   No. C 10-00628 SI, 2012 U.S. Dist. LEXIS 144691 (N.D. Cal. Oct. 4, 2012) ......................19

*Mundi v. Union Sec. Life Ins. Co.*,
 555 F.3d 1042 (9th Cir. 2009)..............................................................................13, 16

*Oracle Am., Inc. v. Myriad Grp. A.G.*,
 724 F.3d 1069 (9th Cir. 2013)........................................................................................8

*Qualcomm Inc. v. Nokia Corp.*,
 466 F.3d 1366 (Fed. Cir. 2006).....................................................................................13

*Ramirez v. Cty. of San Bernardino*,
 806 F.3d 1002 (9th Cir. 2015)..........................................................................................4

*Rent-A-Ctr., W., Inc. v. Jackson*,
 561 U.S. 63 (2010)...............................................................................................7, 8, 10

*Republic of Nicaragua v. Standard Fruit Co.*,
 937 F.2d 469 (9th Cir. 1991)..........................................................................................17

*Roszak v. U.S. Foodservice, Inc.*,
 No. 13-17160, 2016 U.S. App. LEXIS 514 (9th Cir. Jan. 6, 2016)..............................8

*Sanford v. Member Works, Inc.*,
 483 F.3d 956 (9th Cir. 2007)..........................................................................................17

*Sec. Watch, Inc. v. Sentinel Sys. Inc.*,
 176 F.3d 369 (6th Cir. 1999)..........................................................................................20

*Simula, Inc. v. Autoliv, Inc.*,
 175 F.3d 716 (9th Cir. 1999)..........................................................................................15

*Sonic-Calabasas A, Inc. v. Moreno*,
 311 P.3d 184 (Cal. 2013) ..............................................................................................21

*In re TFT-LCD Antitrust Litig.*,
 No. M 07-1827 SI MDL, 2011 U.S. Dist. LEXIS 106268
 (N.D. Cal. Sep. 19, 2011)........................................................................................18, 20

*Three Valleys Municipal Water District v. E.F. Hutton & Co.*,
 925 F.2d 1136 (9th Cir. 1991)..................................................................................17, 19

*Tompkins v. 23andMe, Inc.*,
 No. 5:13-CV-05682-LHK, 2014 U.S. Dist. LEXIS 88068
 (N.D. Cal. June 25, 2014) .......................................................................................10, 12

*United Commc'ns Hub, Inc. v. Qwest Commc'ns, Inc.*,
 46 F. App'x 412 (9th Cir. 2002) ....................................................................................23

*Zenelaj v. Handybook Inc.*,
 82 F. Supp 968 (N.D. Cal. 2015) ...............................................................................8, 13

**Statutes**

9 U.S.C. § 2 .................................................................................................................... 19

9 U.S.C. § 3 .................................................................................................................... 13

Cal. Civ. Code § 1670.5 .................................................................................................. 22

**INTRODUCTION**

Over the past several years, many Americans have tried to file their tax returns only to learn that tax returns had already been filed in their names by fraudsters.  These fraudsters took advantage of Intuit's deficient authentication and security policies to open false accounts and file fraudulent returns through TurboTax in their victims' names.  Some of those affected had previously been TurboTax customers, while others had never used TurboTax.  In all cases, however, the fraud that Intuit enabled and encouraged had nothing to do with any of the victims' actual (*i.e.*, legitimate) use of TurboTax (if any), but rather was conducted by fraudsters pursuant to separate consumer contracts entered into between the fraudsters and Intuit.

The eight named Plaintiffs in this case are among the many victims of the tax fraud that Intuit's conduct enabled and encouraged, and they bring claims against Intuit on behalf of themselves and others similarly situated.  Intuit now argues that five of the Plaintiffs—who happened to have used TurboTax themselves sometime in the past (Carol Knoch, James Lebinski, Todd Siegel, David Stock, and Marilyn Williams) (collectively, the "Customer Plaintiffs")— should be forced to resolve their claims through arbitration.  Intuit's partial motion to compel arbitration should be denied.

By Intuit's own design, each use or download of TurboTax (*i.e.*, for a particular user and for a particular tax year ("TY")) is subject to a separate "contract" with Intuit.  In connection with each such use or download, the user is required, contemporaneously, to check a box confirming their "agreement" to the contract applying to that use or download.  This case involves only the use of TurboTax by *fraudsters*, not legitimate customers.  Thus, any contracts that might apply to the conduct at issue in this case were entered into not by the Customer Plaintiffs, but by the fraudsters themselves.  The claims in this case—for the Customer Plaintiffs and other Plaintiffs, alike—have nothing to do with Plaintiffs' actual use of TurboTax (or whether they even used TurboTax at all) or with the contracts that any Plaintiffs entered into regarding their separate, legitimate use of TurboTax.  Rather, for *all* Plaintiffs, Intuit enabled complete strangers to open entirely separate, fraudulent accounts in Plaintiffs' names and file fraudulent returns through those separate accounts.  In all such cases, the fraudsters necessarily entered into their own

1    contracts with Intuit regarding those uses of TurboTax.  Intuit advances no argument (and none

2    exists) that allows Intuit to force any of the Plaintiffs to arbitrate claims based on an arbitration

3    provision in a contract that Intuit entered into with someone else.

4         Nor is there any plausible argument that the Customer Plaintiffs' claims fall within the

5    substantive scope of any arbitration agreements they had with Intuit.  Any contract the Customer

6    Plaintiffs "agreed" to governs only that particular use or download of TurboTax, not the separate

7    use of TurboTax by complete strangers.  By their terms, the arbitration provisions in Intuit's

8    contracts apply only to claims that relate to Intuit's "Services" or "Agreement."  Intuit's

9    "Services" are expressly defined, in relation to the Customer Plaintiffs, as "***your*** use of the Intuit

10   online services provided to ***you***," not the *fraudster's* separate use of services provided to *them*.

11   Intuit's "Agreement" purports only to govern a customer's legitimate business relationship with

12   Intuit.  Simply put, the conduct that forms the basis for the Customer Plaintiffs' claims is

13   unrelated to the Customer Plaintiffs' actual, legitimate use of Intuit's services, and thus the

14   clauses in any of the Customer Plaintiffs' agreements are inapplicable.

15        Moreover, the Customer Plaintiffs' claims are also beyond the temporal scope of any

16   arbitration agreements they may have had with Intuit.  Intuit structures its agreements and

17   corresponding services so that they apply on a year-to-year basis.  Its services "are not accessible

18   after October 15 of each applicable tax year."  The Customer Plaintiffs' claims stem from

19   fraudulent tax returns filed by fraudsters in TY14.  Although the Customer Plaintiffs attempted to

20   use TurboTax in TY14, they did so only *after* the fraudsters had already opened separate accounts

21   and filed fraudulent TY14 tax returns in their names through TurboTax.  Certainly, earlier (*i.e.*,

22   TY13 and earlier) contracts do not apply, given the way Intuit structures its product and contracts

23   as a year-to-year proposition.  Moreover, Intuit's arbitration provisions do not purport to apply

24   retroactively, and thus the provisions in the Customer Plaintiffs' TY14 contracts cannot serve as a

25   basis to compel any of the Customer Plaintiffs' claims to arbitration.  Finally, Intuit's arbitration

26   provisions expressly state that they do not apply to claims for equitable and injunctive relief,

27   which only this Court can adjudicate.

28

1      The Court, not an arbitrator, must consider whether Intuit's arbitration provision reaches

2  the Customer Plaintiffs' claims.  Intuit presents no evidence, let alone clear and unmistakable

3  evidence, that the Customer Plaintiffs,  who are lay consumers, intended to delegate arbitrability

4  questions to an arbitrator.  Moreover, Intuit's purported delegation clause is laced with multiple

5  layers of ambiguity that prevent this Court from assuming or finding that the Customer Plaintiffs

6  intended to arbitrate arbitrability.  Even if the Court were to find that the Customer Plaintiffs

7  delegated, in their Agreements with Intuit, arbitrability questions to the arbitrator (and they did

8  not), the Court need not and should not refer arbitrability to an arbitrator because Intuit's

9  assertion of arbitrability is wholly groundless; its Agreements with the Customer Plaintiffs cannot

10  be plausibly read to reach the independent conduct of fraudsters that has no relation whatsoever to

11  the Customer Plaintiffs' legitimate use of TurboTax.

12      The Court should deny Intuit's partial motion to compel arbitration.

13  **RELEVANT BACKGROUND**

14      For years, Intuit has designed and implemented certain policies that it knew were

15  encouraging and enabling massive amounts of tax fraud through TurboTax to the annual

16  detriment of many innocent taxpayers.  Despite knowing the consequences of its policies, Intuit

17  made the deliberate choice to carry out these policies in order to generate many millions of

18  dollars in additional fee revenue for itself.  (Second Consolidated Amended Complaint ("SAC"),

19  ¶¶ 3, 40-56.)

20      All of the Plaintiffs in this case—including the Customer Plaintiffs—were harmed as a

21  result of Intuit's conduct.  Their harm had nothing to do with their actual, legitimate TurboTax

22  accounts (if any).  Instead, they were each apparently victims of so-called Stolen Identity Refund

23  Fraud ("SIRF"), whereby fraudsters exploited Intuit's lax policies to open entirely separate, false

24  TurboTax accounts in Plaintiffs' names and file fraudulent tax returns through those separate

25  accounts.  (*Id.*, ¶¶ 26-34, 84, 98, 108, 115, 124, 133, 142 & 152.)  The SIRF that occurred with

26  respect to the Customer Plaintiffs occurred in TY14.  (*Id.*, ¶¶ 115, 124, 133, 142 & 152.)  While

27  the Customer Plaintiffs attempted to use TurboTax to file their returns in TY14, they did so only

28  *after* fraudsters had already entered into contracts with Intuit and filed fraudulent TY14 tax

returns in their names through TurboTax.  (*Id.*, ¶¶ 116, 125-26, 134-37, 143-44 & 153.)  The Customer Plaintiffs and the other Plaintiffs were subject to the exact same alleged misconduct, and that conduct had nothing to do with any of their actual, legitimate dealings with Intuit in the past or in TY14, or even whether they had any legitimate dealings with Intuit at all.  (*Id.*, ¶¶ 1-6, 25-75.)

By Intuit's own design, the fraudsters who opened false TurboTax accounts and filed returns in Plaintiffs' names each entered into their own contracts with Intuit governing those particular uses of Intuit's services.  (*Id.*, ¶¶ 83-84.)  Specifically, by Intuit's design, each use or download of TurboTax is subject to a separate consumer "contract" with Intuit.  (*Id.*, ¶¶ 79-82.)  In connection with each such use or download, the user is required, contemporaneously, to check a box confirming their "agreement" to the contract governing that use or download.  (*Id.*, ¶¶ 81-82.)  Thus, for example, if a customer used TurboTax for TY13 and TY14, those two uses were subject to different "contracts"[1]—one for TY13 and one for TY14.  (*Id.*, ¶ 82.)  Similarly, if two different users download TurboTax in a given year, their respective uses would be governed by separate "contracts"—*i.e.*, the ones they each individually "agreed to" when they began using TurboTax.  (*Id.*, ¶¶ 83-86.)

Plaintiffs filed their Second Consolidated Amended Complaint on December 18, 2015. (ECF No. 69.) Plaintiffs assert claims for (1) violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*; and common law claims of (2) negligence; (3) aiding and abetting fraud; (3) negligent enablement of third-party imposter fraud; and (4) unjust enrichment.[2]

---

[1] Intuit occasionally makes changes to its contracts from one tax year to the next.  (*Compare, e.g.*, Co Decl. II, Ex. 9 *with* Co Decl. II, Ex. 10.)

[2] Intuit's repeated references to Plaintiffs' First Amended Complaint and the breach of contract claims alleged therein are of no moment because they have not been re-alleged in Plaintiffs' Second Consolidated Amended Complaint.  Few notions are as well established as the principle that an "amended complaint supersedes the original, the latter being treated thereafter as non-existent."  *Ramirez v. Cty. of San Bernardino*, 806 F.3d 1002, 1008 (9th Cir. 2015) (quoting *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1474 (9th Cir. 1997)) ("Plaintiff's Second Amended Complaint superseded the First Amended Complaint, and the First Amended Complaint ceased to exist.").

On February 4, 2016, Intuit filed a Motion to Compel Arbitration ("Mot").  (ECF No. 76.) Intuit claims that it is entitled to an order compelling arbitration because (1) to access and use TurboTax, users must accept either the TurboTax Online ("TTO") Terms of Service ("TOS") or the TurboTax Desktop ("TTD") End User License Agreement ("EULA") (collectively, the "Agreements"); (2) the Agreements govern Intuit's relationship with its users, including the Customer Plaintiffs; and (3) the Agreements each contain identical provisions requiring the Customer Plaintiffs to arbitrate their disputes with Intuit.

Each of the Agreements (including those entered into by Plaintiffs and those entered into separately by the fraudsters) contains the following arbitration provision:

> **DISPUTES.** ANY DISPUTE OR CLAIM RELATING IN ANY WAY TO THE SERVICES OR THIS AGREEMENT WILL BE RESOLVED BY BINDING ARBITRATION, RATHER THAN IN COURT, except that you may assert claims in small claims court if your claims qualify. The Federal Arbitration Act governs the interpretation and enforcement of this provision; the arbitrator shall apply California law to all other matters. Notwithstanding anything to the contrary, any party to the arbitration may at any time seek injunctions or other forms of equitable relief from any court of competent jurisdiction. WE EACH AGREE THAT ANY AND ALL DISPUTES MUST BE BROUGHT IN THE PARTIES' INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. BY ENTERING INTO THIS AGREEMENT AND AGREEING TO ARBITRATION, YOU AGREE THAT YOU AND INTUIT ARE EACH WAIVING THE RIGHT TO FILE A LAWSUIT AND THE RIGHT TO A TRIAL BY JURY. IN ADDITION, YOU AGREE TO WAIVE THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR LITIGATE ON A CLASS-WIDE BASIS. YOU AGREE THAT YOU HAVE EXPRESSLY AND KNOWINGLY WAIVED THESE RIGHTS.
>
> To begin an arbitration proceeding, send a letter requesting arbitration and describing your claim to Intuit Inc., in care of our registered agent Corporation Service Company, 2711 Centerville Road, Wilmington, DE 19808. Arbitration will be conducted by the American Arbitration Association (AAA) before a single AAA arbitrator under the AAA's rules**,** which are available at www.adr.org or by calling 1-800-778-7879. Payment of all filing, administration and arbitrator fees and costs will be governed by the AAA's rules, but if you are unable to pay any of them, Intuit will pay them for you. In addition, Intuit will reimburse all such fees and costs for claims totaling less than $75,000 unless the arbitrator determines the claims are frivolous. Likewise, Intuit will not seek its attorneys' fees or costs in arbitration unless the arbitrator determines your claims or defenses are frivolous. You may choose

1
2
3
4

to have the arbitration conducted by telephone, based on written submissions, or in person in the county where you live or at another mutually agreed location. The decision of the arbitrator shall be final and not appealable, and judgment on the arbitration award may be entered in any court having jurisdiction thereof. This Section 14 shall survive expiration, termination or rescission of this Agreement.

5

(Co. Decl. II, Exs. 2, 5 & 9, § A.14 at 4; *see also* Ex. 10, § A.13 at 3 (emphasis original).)

6       Intuit's Agreements contain several critical limitations on the scope of their reach.  Intuit's

7   definition of "Services" makes clear that, in each instance, Intuit is providing only one particular

8   user a license to use TurboTax—the user entering into the agreement.  For example, Intuit's TOS

9   explains: "This Agreement describes the terms governing *your* use of the Intuit online services

10  provided to *you* on this website, including content, updates and new releases, (collectively, the

11  "Services")."  (Co. Decl. II, Exs. 2 & 5, § A.1 at 1 (emphasis added).)  Intuit's EULA similarly

12  provides:  "This Agreement describes the terms governing *your* use of the Intuit Software

13  including content, updates and new releases (collectively, the "Software")...."  (Co. Decl. II, Exs.

14  9 & 10, § A.1.1 at 1 (emphasis added).)  The Agreements further provide that they relate

15  exclusively to the use of TurboTax for a particular specified tax year.  (Co. Decl. II, Exs. 2 & 5, §

16  B.3 at 5 ("The Services are not accessible after October 15 of each applicable tax year…"); *see*

17  *also* §§ B.2.2.b & B.2.6; Ex. 9, § B.2.ii at 5; Ex. 10, § B.2.ii at 4.)

18                                              **ARGUMENT**

19       **A.      The Court Properly Decides Arbitrability.**

20       Intuit's misguided assertion of arbitration must fail because the Customer Plaintiffs'

21  Agreements with Intuit have no relationship to the claims the Customer Plaintiffs now assert.

22  The Court, not an arbitrator, must decide whether the arbitration provision—which on its face

23  applies only to each individual Customer Plaintiff's legitimate use of TurboTax—could possibly

24  reach the Customer Plaintiff's claims, which stem from entirely unrelated conduct attributable

25  solely to independent fraudsters.  First, Intuit has failed to introduce any evidence that lay

26  consumers like the Customer Plaintiffs would have clearly and unmistakably understood Intuit's

27  threadbare reference to "the AAA's rules" to mean that an arbitrator and not the Court would

28  decide questions of arbitrability.  Second, even if the Court were to find that Intuit's threadbare

1    reference constituted a clear and unmistakable delegation (and it did not), the Court must, in any

2    event, reject arbitrability in this case because Intuit's argument for applying the arbitration

3    provision to the claims here is wholly groundless.  Intuit's Agreements with the Customer

4    Plaintiffs cannot be plausibly read to reach the independent acts of fraudsters that are not in any

5    way related to the Customer Plaintiffs' legitimate use of TurboTax.

6                    **1.    There is No Clear and Unmistakable Delegation Here.**

7           The Supreme Court has cautioned that "[c]ourts should not assume that the parties agreed

8    to arbitrate arbitrability…." *First Options of Chicago v. Kaplan*, 514 U.S. 938, 944-45 (1995).

9    Unless the parties "clearly and unmistakably provide otherwise, the question of whether the

10   parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT&T Techs. V.*

11   *Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986).  This "heightened standard," *Rent-A-Ctr.,*

12   *W., Inc. v. Jackson*, 561 U.S. 63, 69 n.1 (2010), "reverses the presumption" that normally weighs

13   in favor of arbitration, *Kaplan*, 514 U.S. at 944-45; *Mohamed v. Uber Techs., Inc.*, 109 F. Supp.

14   3d 1185, 1199 (N.D. Cal. 2015).  Where an arbitration provision is silent or ambiguous as to

15   whether the parties agreed to arbitrate arbitrability, the court must protect a party's access to

16   court.  *Kaplan*, 514 U.S. at 944-45; *Meadows v. Dickey's Barbecue Rests., Inc.*, No. 15-cv-02139-

17   JST, 2015 U.S. Dist. LEXIS 153385, at *9 (N.D. Cal. Nov. 12, 2015) ("[A]mbiguities as to the

18   delegation of arbitrability are resolved in favor of court adjudication.").

19          Cloistered away in the fourteenth paragraph of Intuit's TOS is the statement that

20   arbitration will be conducted "under the AAA's rules."  (Co. Decl. II, Ex. 5 § A.14 at 4.[3])  From

21   these four words, Intuit would have the Court believe that lay consumers "clearly and

22   unmistakably" yielded their right to have the court decide whether their disputes are subject to

23   arbitration.  Intuit's inclusion of these four words—which were neither in bold, nor italics, nor

24   caps—is not, by itself, sufficient to support delegation.  *See Ellsworth v. United States Bank,*

25   *N.A.*, No. C 12-02506 LB, 2012 U.S. Dist. LEXIS 134252, at *19-21 (N.D. Cal. Sep. 19, 2012)

26   ("If mere identification of the AAA Rules necessarily delegated all questions of arbitrability, the

---

27   [3] Intuit advanced the arbitration provision in the TY14 EULA from the fourteenth paragraph to
     the thirteenth paragraph.  (*Compare* Co Decl. II, Ex. 9 § A.14 at 4 *with* Co. Decl. II, Ex. 10, §
28   A.13 at 3-4.)

1    contracting parties' ability to limit the shape and scope of a delegation would be impaired.").

2    Instead, for Intuit to prevail on the issue of delegation, the Court must conclude that such a result

3    was intended "based on an assumption about the parties' expectations." *Rent-A-Ctr.*, 561 U.S. at

4    69 n.1.  The Supreme Court has cautioned that where consumers "would likely have expected a

5    court to have decided the gateway matter . . . we assume that is what they agreed to." *Id.*

6        Intuit relies on two cases to argue that its threadbare reference to "the AAA's rules"

7    clearly and unmistakably delegated questions of arbitrability.  Both cases are easily distinguished.

8    *Brennan v. Opus Bank*, for example, involved an employment dispute between "an experienced

9    attorney and businessman (a partner at Jones Day from 1984 to 2001, and Senior Vice President,

10    General Counsel, and Deputy Chief Legal Officer of Washington Mutual from 2001 to 2008),

11    who executed an executive-level employment contract with Opus Bank, a sophisticated, regional

12    financial institution."  796 F.3d 1125, 1131 (9th Cir. 2015).  While holding that under the

13    circumstances incorporating the AAA's rules constituted clear and unmistakable evidence of

14    intent to arbitrate arbitrability, the Ninth Circuit expressly "limit[ed] our holding to the facts of

15    the present case," namely, "an arbitration agreement between sophisticated parties."  796 F.3d at

16    1131.  Similarly, this Court's ruling in *Zenelaj v. Handybook Inc.* involved agreements entered

17    into by experienced businesswomen who had experience with employment contracts of the sort

18    that contained the challenged clauses at issue there.  82 F. Supp. 3d 968, 974 (N.D. Cal. 2015).[4]

19        Contrary to Intuit's suggestion, courts within the Ninth Circuit are split as to whether a

20    threadbare reference to an arbitration provider's rules clearly and unmistakably delegates

21    threshold questions of arbitrability to an arbitrator.  In *Aviles v. Quik Pick Express, LLC*, Judge

22    Fitzgerald recently declined to find that such a reference constituted clear and unmistakable

23    evidence of intent to arbitrate arbitrability.  No. CV-15-5214-MWF (AGR), 2015 U.S. Dist.

24    ---

25    [4] Related authority is equally inapposite.  Although not cited by Intuit, *Oracle Am., Inc. v. Myriad Grp. A.G.*, involved a dispute between two large software companies; the Ninth Circuit limited its holding to "express no view as to the effect of incorporating arbitration rules into consumer

26    contracts."  724 F.3d 1069, 1075 n.2 (9th Cir. 2013).  Similarly, the Ninth Circuit's recent unpublished opinion in *Roszak v. U.S. Foodservice, Inc.* also involved a challenge to an

27    arbitration agreement brought by a sophisticated plaintiff who held a long-time leadership position while serving in a senior management role with his former employer.  No. 13-17160,

28    2016 U.S. App. LEXIS 514 (9th Cir. Jan. 6, 2016).

LEXIS 174960, at *16 (C.D. Cal. Dec. 3, 2015). *Aviles* involved a misclassification suit brought on behalf of a class of truck drivers. Before the defendant carrier permitted drivers to carry cargo on their behalf, the carrier required each driver to sign a subhaul agreement that warned in bold that "any controversy arising out of or related to this Agreement . . . shall be submitted to JAMS for final and binding arbitration in accordance with its comprehensive rules and procedures that are in effect at the time the arbitration is filed." *Id.* As is true here, the truck drivers were not sophisticated parties but were "inexperienced individual[s], untrained in the law" who signed contracts "without the benefit of counsel." *Id.* at *17-18. Even though the clause was highlighted in bold (unlike here), Judge Fitzgerald found that it was "doubtful that Plaintiff actually understood the import of its terms." *Id.* at *18. Judge Fitzgerald found that it "would strain credulity to conclude that Plaintiff held a clear and unmistakable intent to delegate questions of arbitrability to an arbitrator." *Id.*

*Aviles* is far from an outlier. Judge Tigar reached a similar conclusion in *Meadows v. Dickey's Barbecue Rests.*, which involved an attempt by Dickey's barbeque chain to compel arbitration as to two groups of disenchanted franchisees. 2015 U.S. Dist. LEXIS 153385. Judge Tigar granted Dickey's request as to the first group whose franchise agreements contained a provision mandating arbitration for all disputes, including "the validity of this Agreement or any other agreement between the parties, or any provision thereof." *Id.* at *10-11. Judge Tigar, however, denied Dickey's motion with regard to the second group whose agreements contained a more generic delegation clause, similar to the one at issue here, which mandated arbitration with regard to "all disputes, controversies, claims, causes of action and/or alleged breaches or failures to perform arising out of or relating to this Agreement (and attachments) or the relationship created by this Agreement." *Id.* at *5.

Judge Tigar recognized that the language "arising out of or relating to" the franchise agreement was "so broad, it might theoretically encompass the threshold issue of arbitrability," but found that it did "not rise to the level of 'clear and unmistakable evidence' of delegation required to defeat the presumption that the court, not the arbitrator, will decide the issue of arbitrability." *Id.* at *13-14. Importantly, in reaching his conclusion, Judge Tigar considered the

1   relative position of the parties, finding that the franchise agreements were "more like consumer

2   contracts than like commercial ones, owing to the lower sophistication and inferior bargaining

3   position of franchisees." *Id.* at *18.  Because the franchisees were "far less sophisticated than

4   Dickey's" and were asked to sign complicated agreements "containing a myriad of legal terms"

5   despite having no legal training, it could not be said that the franchisees clearly and unmistakably

6   delegated their right to have the court decide threshold questions of arbitrability. *Id.* at *17-18.

7       As in *Aviles* and *Meadows*, the Customer Plaintiffs here cannot be said to have clearly or

8   unmistakably delegated threshold questions of arbitrability.  The Customer Plaintiffs are lay

9   consumers of a product marketed as helping the common man navigate tax issues.  Notably,

10   Intuit's contracts specifically prohibit using TurboTax "for any commercial purpose" or "on a

11   professional or commercial basis."  (Co. Decl. II, Ex. 9, § B.2.C at 6; Ex. 10, § B.2.C at 5; *see*

12   *also* Ex. 2, § B.1.2 at 4; Ex. 5, § B.1.3 at 4.)

13       Common sense dictates that the Customer Plaintiffs would not have understood that a

14   threadbare reference to the AAA's rules, if the Customer Plaintiffs even saw it, meant that they

15   were delegating their right to have the Court decide whether a dispute was even subject to the

16   arbitration provision.

17       Intuit fails to introduce any evidence in its moving papers establishing that the Customer

18   Plaintiffs "would likely have expected a court to have decided the gateway matter…." *Rent-A-*

19   *Ctr.*, 561 U.S. at 69 n.1.  This failure to satisfy the applicable "heightened standard," *id.*, provides

20   the court with no evidentiary basis to support the conclusion that the Customer Plaintiffs agreed

21   to arbitrate arbitrability.  To accept Intuit's argument that a bare reference to "the AAA's rules"

22   constitutes a clear and unmistakable delegation would render the clear and unmistakable test

23   nothing more than a hollow and indefensible legal fiction.

24       Moreover, Judge Koh's opinion in *Tompkins v. 23andMe, Inc.*, No. 5:13-CV-05682-LHK,

25   2014 U.S. Dist. LEXIS 88068, at *45-47 (N.D. Cal. June 25, 2014), from which *Aviles* and

26   *Meadows* drew support, provides further grounds for denying Intuit's motion because it is unclear

27   which AAA rules would apply to any potential arbitration.  *Tompkins* involved an attempt to

28   compel arbitration on the basis of a clause that provided that arbitration would be conducted

1    under the "rules and auspices of the American Arbitration Association."  *Id.*  Judge Koh found "at

2    least two ambiguities in the arbitration provision's reference to the AAA rules" that are present in

3    this case:  "lack of identification of specific AAA rules, and uncertainty as to whether the

4    Consumer Rules apply in addition to the Commercial Rules."  *Id.* at *38-39.

5         Here, too, Intuit, in its motion, does not say which AAA rules apply, citing only in passing

6    the AAA's Consumer Rules.  (Mot. 11.)  Even though Intuit's reference to "the AAA's rules" has

7    not changed since Intuit's arbitration provision was first introduced in 2012, the underlying AAA

8    rules to which Intuit refers have changed several times.  In none of the underlying schemes is it

9    clear which specific rules would apply to a dispute with a consumer at any given moment.

10        When Intuit first referred to "the AAA rules" in 2012, the reference likely applied to the

11   AAA's Commercial Arbitration Rules that took effect on June 1, 2009.  (Declaration of Roger N.

12   Heller, dated March 11, 2016 ("Heller Decl."), Ex. A.)  Those rules were amended as of October

13   1, 2013.  (Heller Decl., Ex. B.)  Both sets of rules state that the Commercial Arbitration Rules

14   shall be deemed to have been made a part of the arbitration agreement whenever the parties

15   provide for arbitration by the AAA "without specifying particular rules."  (Heller Decl., Ex. A, R-

16   1(a) at 13; Ex. B, R-1(a) at 7.) R-1(a).)  Both sets of rules, however, state in Rule R-1 that AAA

17   would apply the "Supplementary Procedures for Consumer-Related Disputes to arbitration

18   clauses in agreements between individual consumers and businesses where the business has a

19   standardized, systematic application of arbitration clauses with customers" whose terms were

20   non-negotiable.  (Heller Decl., Ex. A, R-1 at 14; Ex. B, R-1 at 7.[5])  Rule C-1(a) of the

21   Supplementary Procedures for Consumer-Related Disputes, however, states that the "AAA's

22   most current rules will be used when the arbitration is started," referring back to the AAA's

23   Commercial Arbitration Rules, and goes on to specifically note that the "AAA will have the

---

24   [5] Compounding the ambiguity, AAA publishes a second version of its Commercial Arbitration
     Rules that also purports to have an effective date of October 1, 2013.  American Arbitration
25   Association, Most Commonly Viewed Rules,
     https://www.adr.org/aaa/faces/rules/searchrules/rulesdetail?doc=ADRSTG_004130 (last accessed
26   March 11, 2016.)  This second version, which contains no reference to the Supplementary
     Procedures for Consumer-Related Disputes, also claims that parties are "deemed to have made
27   these rules a part of their arbitration agreement whenever they have provided for arbitration by
     the American Arbitration Association... of a domestic commercial dispute without specifying
28   particular rules."  (Heller Decl., Ex. E, R-1(a).)

PLFS' MEMO IN OPPOSITION TO MOTION TO
COMPEL ARBITRATION; 15-CV-1778-EJD-PSG

1    discretion to apply or not to apply the Supplementary Procedures."  (Heller Decl., Ex. C, C-1(a) at

2    8.)  As of September 1, 2014, the AAA again changed the rules that would potentially apply to

3    consumer disputes, rebranding the Supplementary Procedures for Consumer-Related Disputes as

4    the Consumer Arbitration Rules.  (Heller Decl., Ex. D.)  Yet despite this change, the AAA

5    continues to make clear that "[t]he AAA has the discretion to apply or not to apply the Consumer

6    Arbitration Rule."  (Heller Decl., Ex. D, at 6 [sic]; *see also* R-1(e) at 11 ("The AAA has the initial

7    authority to apply or not to apply the Consumer Arbitration Rules.").)

8            As in *Tompkins*, Intuit has failed to identify which specific AAA rules would govern any

9    dispute with the Customer Plaintiffs, and it is apparent that the Customer Plaintiffs had no ability

10   to understand which set of AAA rules would, in fact, potentially apply to any dispute subject to

11   the arbitration provision.  These multiple layers of ambiguity establish that the meaning of any

12   reference to "the AAA's rules" could hardly have been either clear or unmistakable.

13           In light of the above, Intuit's delegation argument must fail because it cannot be said that

14   the Customer Plaintiffs clearly and unmistakably delegated the question of arbitrability to the

15   arbitrator.  In the absence of any evidence to the contrary, the Court "should not assume that the

16   parties agreed to arbitrate arbitrability…."  *Kaplan*, 514 U.S. at 944-45.  Rather, the Court must

17   decide whether Plaintiffs' dispute falls within the scope of Intuit's arbitration provision.

18           **2.      The Court Can and Should, Itself, Deny Arbitration in All Events**
               **Because Intuit's Arbitration Argument is Wholly Groundless.**

19           Even if the Court were to conclude that the Customer Plaintiffs clearly and unmistakably

20   delegated questions of arbitrability to the arbitrator (which they did not), the Court can and

21   should, itself, deny Intuit's partial motion to compel arbitration because it is wholly groundless

22   for Intuit to claim that its contracts with the Customer Plaintiffs—which *only* purport to govern

23   the Customer Plaintiffs' uses of TurboTax—relate in any way to the entirely separate uses of

24   TurboTax by fraudsters that constitute the basis of the Customer Plaintiffs' claims here.  *See, e.g.*,

25   *Ellsworth*, 2012 U.S. Dist. LEXIS 134252, at *15 (the Court itself must resolve arbitrability, even

26   where there is clear delegation, where the movant's arbitration claim is wholly groundless)

27   (collecting cases).

28

"[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs.*, 475 U.S. at 648 (arbitration agreements are merely "a matter of contract"). Regardless of how broad a contract's terms may be, those terms can reach *only* to those matters the parties "*intended* to contract." *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1045 (9th Cir. 2009) (citation omitted). There is thus no presumption in favor of arbitration where, as here, the "contractual language is plain that arbitration of a particular controversy is not within the scope of the arbitration provision." *Id.* at 1044-45 (quoting *In re Tobacco Cases I*, 21 Cal. Rptr. 3d 875, 887 (Ct. App. 2004)).

As this Court has recognized, before it can be "satisfied that [an] issue… is referable to arbitration," 9 U.S.C. § 3 (2012 & Supp. III 2015), it must first determine "whether the assertion of arbitrability is 'wholly groundless.'" *Zenelaj*, 82 F. Supp. 3d at 975 (quoting *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1371 (Fed. Cir. 2006) (applying California law)). The wholly groundless inquiry prevents parties from doing exactly what Intuit attempts to do here: "asserting any claim at all, no matter how divorced from the parties' agreement, to force an arbitration." *Interdigital Commc'ns, LLC v. ITC*, 718 F.3d 1336, 1346-47 (Fed. Cir. 2013) (applying California law) (quoting *Qualcomm*, 466 F.3d at 1373), vacated on other grounds, 134 S. Ct. 1876 (2014). To determine whether Intuit's attempt to force arbitration is wholly groundless, the Court "should look to the scope of the arbitration clause and the precise issues that the moving party asserts are subject to arbitration." *Qualcomm*, 466 F.3d at 1374. Such an inquiry "necessarily requires the courts to examine and, to a limited extent, construe the underlying agreement." *Dream Theater, Inc. v. Dream Theater*, 21 Cal. Rptr. 3d 322, 326 (Ct. App. 2004).

*Douglas v. Regions Bank,* 757 F.3d 460, 462-63 (5th Cir. 2014), is particularly instructive. In *Douglas*, the defendant bank tried to enforce an arbitration provision, from a contract governing plaintiff's closed bank account, to force plaintiff to arbitrate her claims against the bank for allowing an attorney to embezzle funds from an entirely unrelated account. The Court of Appeals denied defendant's motion and rejected defendant's argument (similar to Intuit's argument here) that the issue of arbitrability should be decided by an arbitrator under the provision's delegation clause. As the Court of Appeals explained:

1

2

3

4

5

> The mere existence of a delegation provision in [one] arbitration agreement… cannot possibly bind [plaintiff] to arbitrate gateway questions of arbitrability in *all* future disputes with the other party, no matter their origin… If it were otherwise, then every case involving an arbitration agreement with a delegation provision must, with no exceptions, be submitted for such gateway arbitration; no matter how untenable the argument that there is some connection between the dispute and the agreement, an arbitrator must decide first.

6  757 F.3d at 462-63.  Ninth Circuit law is no different.  *See, e.g.*, *Ellsworth*, 2012 U.S. Dist.

7  LEXIS 134252, at *24 (finding attempt to arbitrate "separate" and "discrete" agreements that

8  "deal with entirely separate transactions" as wholly groundless); *ASUS Computer Int'l v.*

9  *InterDigital, Inc.*, No. 15-cv-01716-BLF, 2015 U.S. Dist. LEXIS 118794, at *17-18 (N.D. Cal.

10  Aug. 25, 2015) (finding that assertion of arbitrability for "separate business transaction[s]" was

11  wholly groundless).

12      Intuit's assertion of arbitration is wholly groundless because the Customer Plaintiffs'

13  respective Agreements with Intuit govern only their own  legitimate uses of TurboTax for the

14  particular tax year covered—they do not (and cannot) reach claims that stem entirely from the

15  independent acts of, and wholly separate uses of TurboTax by, fraudsters, which are governed by

16  the fraudsters' own contracts with Intuit.  The Customer Plaintiffs assert the same claims

17  stemming from the same operative facts as all other Plaintiffs.  Intuit cannot leverage the

18  happenstance of the Customer Plaintiffs' legitimate use of TurboTax to force them to arbitrate

19  claims that relate entirely to the independent acts and uses of TurboTax by fraudsters.

20      Accordingly, as explained further below, Intuit's attempt to partially compel arbitration is

21  wholly groundless and should be denied.

22      **B.      The Customer Plaintiffs' Claims Fall Well Beyond the Scope of Any**
            **Arbitration Agreement They Have With Intuit.**

23

24      As set forth above, the Court can and should decide arbitrability here.  The Court should

25  deny Intuit's partial motion to compel arbitration because the Customer Plaintiffs' claims fall well

26  beyond the reach of the arbitration provisions in their Agreements with Intuit.  First, the Customer

27  Plaintiffs' claims are entirely unrelated to their Agreements with Intuit, which do not purport to

28  reach third parties' entirely separate uses of TurboTax or other conduct that is unrelated to the

particular Customer Plaintiff's legitimate use of TurboTax.  Second, the Customer Plaintiffs'

claims are also beyond the temporal scope of any of their Agreements with Intuit.  Finally, by its

terms, Intuit's arbitration provision does not apply to the Customer Plaintiffs' claims for

injunctive or other equitable relief brought under California's Unfair Competition Law.

### 1.   The Customer Plaintiffs' Claims Are Unrelated to Their Actual Dealings With Intuit and Are Thus Outside the Substantive Scope of Any Arbitration Agreement They Have With Intuit.

None of the claims asserted in the SAC remotely fall within the scope of the arbitration

provisions in *the Customer Plaintiffs'* Agreements with Intuit, since all of the Plaintiffs' claims

are based on totally separate uses—by fraudsters, not by Plaintiffs—of Intuit's services.  As

alleged, for all of the Customer Plaintiffs and other Plaintiffs, alike, Intuit encouraged and

enabled fraudsters to open entirely separate, false accounts in the Plaintiffs' names and file

fraudulent returns through those separate accounts.

Arbitration is "a way to resolve those disputes—but only those disputes—that the parties

have agreed to submit to arbitration."  *Kaplan*, 514 U.S. at 943.  Accordingly, "a party cannot be

required to submit to arbitration any dispute which he has not agreed so to submit.'" *AT&T

Techs.*, 475 U.S. at 648 (citation omitted); *see also John Wiley & Sons, Inc. v. Livingston*, 376

U.S. 543, 547 (1964) ("The duty to arbitrate being of contractual origin, a compulsory submission

to arbitration cannot precede judicial determination that the… agreement does in fact create such

a duty."); *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002).  Even the broadest

arbitration provisions can only reach disputes that have a "a significant relationship to *the

contract*" or that have "their *origin or genesis in the contract*."  *Simula, Inc. v. Autoliv, Inc*., 175

F.3d 716, 720-21 (9th Cir. 1999) (emphasis added).

The Customer Plaintiffs' claims here have nothing to do with their contracts with Intuit.

The tax fraud that Intuit enabled and encouraged, and which harmed all of the Customer

Plaintiffs, had nothing to do with the Customers' Plaintiffs' actual (*i.e.*, legitimate) uses of

TurboTax (or whether they even used TurboTax before).  That conclusion is underscored by the

fact that two of the Plaintiffs in this case (Brown and Fugatt) have never used TurboTax and yet

1   were subjected to the exact same conduct as the Customer Plaintiffs.  Intuit argues that the "issues

2   central to this dispute… necessarily relate to the TurboTax "SERVICES" OR "SOFTWARE" as

3   those terms are defined…."  (Mot. 18.)  But the "Services" to which Intuit refers are expressly

4   defined in the Agreements as applying exclusively to "*your* use of the Intuit online services

5   provided *to you* on this website, including content, updates, and new releases (collectively "the

6   Services")."  (Co. Decl. II, Ex. 5, § (A)(1) (emphasis added)[6].)  These carefully crafted contracts

7   thus apply *solely* to the individual TurboTax user who signed the agreement.  Absolutely nothing

8   in the provision's language remotely purports to extend coverage to entirely separate uses of

9   TurboTax by complete strangers using different accounts and subject to their own separate

10  contracts with Intuit regarding such uses.

11       Intuit's deliberate decision to narrowly define its "Services" serves as "forceful evidence"

12  of its intent to exclude claims regarding third parties' separate uses of services.  *Koyoc v.*

13  *Progress Fin. Co*., No. CV 13-09165-RSWL (AGRx), 2014 U.S. Dist. LEXIS 65229 at *7 (C.D.

14  Cal. May 9, 2014).  Indeed, given the logically removed nature of the claims here, vis-à-vis the

15  Plaintiffs' legitimate dealings with Intuit, the provision here would need to include clear language

16  that claims arising from another person's separate use of TurboTax were intended to be covered.

17  *See Comer v. Micor, Inc.*, 436 F.3d 1098, 1102 (9th Cir. 2006).  No such language exists here.

18       To the contrary, the provision's plain language here limits its reach to claims arising out

19  of the Customer Plaintiffs' use, and Intuit's provision of, services to the Customer Plaintiffs.

20  Intuit's definition of the "Services" clearly excludes the use of TurboTax by anyone other than

21  the one individual user who entered into the agreement, and certainly excludes separate uses by

22  unrelated persons who entered into their own agreements with Intuit regarding such uses.[7]

23

24

25  [6] (*See also* Co. Decl. II, Exs. 9 & 10, ¶ A.1.1 at 1 ("This Agreement describes the terms
    governing *your use* of the Intuit Software including content, updates and new releases
26  (collectively, the 'Software')…." (emphasis added).)

27  [7] Moreover, even if Intuit had not already waived the argument, Intuit could not plausibly argue
    that the entirely separate contracts between Intuit *and the fraudsters* provide a basis from which it
    could compel the Customer Plaintiffs to arbitrate their claims.  *See Mundi*, 555 F.3d at 1045;
28  *Comer*, 436 F.3d at 1102.

Intuit's attempt to run from its own drafting must fail, as should its attempt to artificially expand the scope of arbitrable claims. Every claim asserted by the Customer Plaintiffs in the SAC falls outside the scope of any valid agreement between the parties. Accordingly, none of the Customer Plaintiffs' claims are subject to arbitration. *AT&T Techs.*, 475 U.S. 643*; Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 476 (9th Cir. 1991).

### 2. The Customer Plaintiffs' Claims Are Also Outside the Temporal Scope of Any Arbitration Agreement They Have With Intuit.

Even if the claims here were not beyond the substantive scope of the Customer Plaintiffs' Agreements with Intuit (which they are), Intuit's motion would still fail because the claims alleged here are also beyond the temporal scope of the Agreements.

The operative timeline of events is undisputed. The Customer Plaintiffs each contracted with Intuit in 2014 to use TurboTax file their TY13 taxes, and did use TurboTax to file their TY13 returns. (Co. Decl. II, ¶ 23 (Mr. Knoch, Mr. Lebinski, and Mr. Siegel used TTO to file their taxes in TY13); ¶ 24 (stating that Mr. Stock used TTO to file his taxes in TY13); ¶ 25 (stating that Ms. Williams used TTD to file her taxes in TY13).) Before the Customer Plaintiffs attempted to file their TY14 taxes through TurboTax in 2015, however, fraudsters—*not* the Customer Plaintiffs—contracted with Intuit and filed fraudulent TY14 returns through TurboTax in the Customer Plaintiffs' names. (SAC, ¶ 116 (Ms. Knoch received an unsolicited refund check from the IRS on March 2, 2015, before she had purchased or attempted to use TurboTax for TY14); ¶¶ 125-26 (Mr. Lebinski first purchased and attempted to use TurboTax for TY14 on April 14, 2015, at which time he learned a fraudulent return had already been filed); ¶¶ 134-37 (Intuit filed a fraudulent tax return in Mr. Siegel's name on February 27, 2015); ¶¶ 143-44 (Mr. Stock first purchased TurboTax for TY 14 on April 11, 2015 and learned two days later that a fraudulent return had already been filed); ¶ 153 (Ms. Williams first attempted to use TurboTax for TY14 on April 14, 2015, at which time she learned a fraudulent return had already been filed).[8]

---

[8] The Customer Plaintiffs are entitled to "all reasonable doubts and inferences that may arise" regarding the timing of contract formation. *Sanford v. Member Works, Inc.*, 483 F.3d 956, 964 n.9 (9th Cir. 2007) (quoting *Three Valleys Mun. Water Dist.*, 925 F.2d at 1141). To the extent Intuit challenges the timing of the contracts formed with any of the Customer Plaintiffs, such

*Footnote continued on next page*

1    As Intuit acknowledges, customers are required to agree to new contracts with Intuit each

2    and every tax year, governing their use of TurboTax for that particular tax year.  (*See, e.g.*, Co

3    Decl. II, ¶¶ 22-25 & Ex. 3 (listing various TurboTax agreements by tax year).)  The contracts, by

4    their terms, do not extend beyond a given tax year.  For example, each of the Customer Plaintiffs'

5    TY13 contracts with Intuit were prominently subtitled in all-caps as applying only to "TAX

6    YEAR 2013."  (Co. Decl. II, Exs. 2 & 9 at 1.)  Similarly, contracts for TY14 were prominently

7    subtitled in all-caps as applying only to "TAX YEAR 2014."  (Co. Decl. II, Exs. 5 & 10 at 1.)  By

8    design, each license to use TurboTax is valid only for one specific tax year.  As explained in

9    TTO's TOS, "[t]he Services are not accessible after October 15 of each applicable tax year…"

10   (Co. Decl. II, Exs. 2 & 5, § B.3 at 5; *see also* §§ B.2.2.b & B.2.6 (tax returns in a given year may

11   be filed "through the Services, up to October 15….").)  Similarly, in TTD's TY13 EULA, Intuit

12   states that users may "use the Software *only* to prepare, print and/or electronically file *federal*

13   *2013 tax year returns* and related state tax returns…."  (Co. Decl. II, Ex. 9, § B.2.ii at 5 (emphasis

14   added); *see also* Co. Decl. II, Ex. 10, § B.2.ii at 5 (same applying to TY14).)

15   Even if the claims here were not outside the substantive scope of the Customer Plaintiffs'

16   Agreements with Intuit (which they are), there would still be no plausible argument that the

17   claims here are within the temporal scope of any arbitration agreement the Customer Plaintiffs

18   entered into with Intuit.  *See In re TFT-LCD Antitrust Litig.*, No. M 07-1827 SI MDL, 2011 U.S.

19   Dist. LEXIS 106268, at *28-31 (N.D. Cal. Sep. 19, 2011) ("[T]he structure of the agreements

20   suggests that each contract governed a discrete series of transactions; each has an explicit start

21   point and end point, with no overlap between them.").  By the terms of Intuit's Agreements, the

22   fraud that occurred here, by virtue of the fraudsters' use of TurboTax in TY14, does not relate to

23   legitimate returns the Customer Plaintiffs filed, or the Customer Plaintiffs' use of TurboTax, in

24   TY13.  Accordingly, Intuit could not compel Plaintiffs to arbitration on the basis of the Customer

25   Plaintiffs' TY13 Agreements governing their legitimate TY13 uses of TurboTax.

26

27   *Footnote continued from previous page*
     challenges have no bearing on the Customer Plaintiffs' other challenges to the scope and validity

28   of Intuit's arbitration provision.

PLFS' MEMO IN OPPOSITION TO MOTION TO
COMPEL ARBITRATION; 15-CV-1778-EJD-PSG

1    Nor could any Customer Plaintiffs' TY14 Agreements, entered into only *after* the fraud

2    that forms the basis for their claims happened, be a proper basis for compelling arbitration.  The

3    FAA expressly distinguishes between prospective and retroactive arbitration clauses, providing:

4    
> A written provision in any . . . contract evidencing a transaction
> involving commerce to settle by arbitration a controversy thereafter
5    
> arising out of such contract . . .or an agreement in writing to submit
> to arbitration an existing controversy arising out of such a contract .
6    
> . .shall be valid, irrevocable, and enforceable, save upon such
> grounds as exist at law or in equity for the revocation of any
7    
> contract.

8    9 U.S.C. § 2 (2012 & Supp. III 2015).  Before an arbitration provision will be construed to have

9    retroactive effect, such that a party is deprived of access the courts, there must be an "express,

10   unequivocal agreement to that effect."  *Three Valleys Mun. Water Dist.*, 925 F.2d at 1141; *Long

11   v. Fid. Water Sys. Inc.*, NO. C-97-20118 RMW, 2000 U.S. Dist. LEXIS 7827, at *10-11 (N.D.

12   Cal. May 24, 2000) ("Defendants have cited no case in which a court retroactively applied an

13   arbitration clause that did not clearly and unequivocally apply to existing claims.").

14   Intuit's arbitration provision, which provides arbitration for "[a]ny dispute or claim

15   relating in any way to the services or this agreement," does not expressly or unequivocally

16   purport to apply retroactively.  Confronted with a similar clause in *Morse v. Servicemaster Global

17   Holdings, Inc.*,[9] Judge Illston found that the use of a present participle—in this case, "relating"—

18   made it clear that the phrase referred to events "going forward, not claims that have already

19   accrued."  No. C 10-00628 SI, 2012 U.S. Dist. LEXIS 144691 at *15 (N.D. Cal. Oct. 4, 2012).

20   The provision's use of "the word 'any' refer[red] to the *material*, not *temporal* scope of the

21   agreement."  *Id.* (emphasis added).  The same logic applies here.  Nor do any other provisions in

22   Intuit's contract operate to give the arbitration provision retroactive effect.[10]

23   
─────────────────────

[9] The clause provided:  "Any dispute arising out of Employee's employment and/or termination
24   of employment with Employer will be submitted to binding arbitration in accordance with the
then-current National Rules for the Resolution of Employment Disputes of the American
25   Arbitration Association ('AAA') . . . Employer and Employee each expressly waive entitlement,
if any, to have any such dispute heard before a court or jury . . . this Agreement applies to any
26   dispute arising out of or related to Employee's employment . . . ."  *Morse v. Servicemaster Global
Holdings, Inc.*, No. C 10-00628 SI, 2012 U.S. Dist. LEXIS 144691, at *15 (N.D. Cal. Oct. 4,
27   2012).

[10] Intuit's merger clause, for example, does not establish otherwise.  The merger clause provides
28   that the agreement for a given tax year "is the entire agreement between you and Intuit and
*Footnote continued on next page*

PLFS' MEMO IN OPPOSITION TO MOTION TO
COMPEL ARBITRATION; 15-CV-1778-EJD-PSG

This common sense interpretation is bolstered by the AAA's rules that Intuit purports to have incorporated. The AAA's Commercial Arbitration Rules provides two standard arbitration clauses. The standard clause that most closely tracks the language of Intuit's arbitration provision provides that "[a]ny controversy or claim arising out of or relating to this contract" shall be settled by arbitration administered by the AAA. (Heller Decl., Exs. B & E, at 8.) This language, the AAA explains, applies exclusively to "*future* disputes." (*Id.* (emphasis added).) By contrast, to assent to arbitrate what the AAA refers to as an "existing dispute" at the time the overall contract is signed, the AAA instructs parties to include an arbitration provision that references "the following Controversy," which the parties must then "describe briefly." (*Id.*) Intuit's arbitration provision neither references nor describes any controversy that existed at the time the Customer Plaintiffs "agreed" to any contracts here.

### 3.   Only the Court Can Hear the Customer Plaintiffs' Claims Seeking "Injunctions or Other Forms of Equitable Relief."

Even if the Customer Plaintiffs' Agreements were applicable here (which they are not) some of their claims would still not be subject to arbitration. Intuit's arbitration provision expressly provides that any party to the arbitration provision "may at any time seek injunctions or other forms of equitable relief from any court of competent jurisdiction." (Co. Decl. II, Ex. 2 § 14.)

The Customer Plaintiffs, like all Plaintiffs, pray for, among other things, equitable and injunctive relief. Plaintiffs' First Cause of Action is brought under California's Unfair

---

*Footnote continued from previous page*

replaces all prior understandings, communications and agreements, oral or written, regarding its subject matter." (Co. Decl. II, Ex. 5, ¶ 15 at 4.) Such language, without more, is insufficient to cause the arbitration provision to apply retroactively. *E.g.*, *In re TFT-LCD Antitrust Litig.*, 2011 U.S. Dist. LEXIS 106268, at *28-31 ("[T]he structure of the agreements suggests that each contract governed a discrete series of transactions; each has an explicit start point and end point, with no overlap between them. Given this structure, the Court sees nothing to indicate that the parties intended the integration clause to reach prior, fully performed contracts."); *see also Int'l Ambassador Programs, Inc. v. Archexpo*, 68 F.3d 337, 340 (9th Cir. 1995); *Sec. Watch, Inc. v. Sentinel Sys. Inc.*, 176 F.3d 369, 372 (6th Cir. 1999) (noting that the "universally understood purpose" of an integration clause is to "preclude the subsequent introduction of evidence of preliminary negotiations or of side agreements" and finding that despite the presence of an arbitration clause that was "very broad in scope . . . this breadth of scope does not extend over time.").

Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*  (SAC, ¶¶ 174-191.)

Because a claim under the UCL is "equitable in nature" and generally limits prevailing parties to

"injunctive relief and restitution," *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 943

(Cal. 2003) (citation omitted), there is no plausible argument that the Customer Plaintiffs' UCL

claim here falls within the scope of Intuit's arbitration provision.  *See also Ferranti v. Hewlett-*

*Packard Co.*, No. 5:13-cv-03847-EJD, 2015 U.S. Dist. LEXIS 121598, at *15 (N.D. Cal. Sept.

10, 2015) (Davila, J.) ("The UCL 'provides an equitable means through which both public

prosecutors and private individuals can bring suit to prevent unfair business practices and restore

money or property to victims of these practices.'" (quoting *Yanting Zhang v. Superior Court*, 304

P.3d 163 (Cal. 2013))).

### 4. Intuit's Arbitration Provision is Unconscionable.

Intuit also cannot seek to compel the Customer Plaintiffs to arbitration because the

arbitration provision on which it relies is unconscionable.  *Elite Logistics Corp. v. Hanjin*

*Shipping Co.*, 589 F. App'x 817, 818 (9th Cir. 2014); *Sonic-Calabasas A, Inc. v. Moreno*, 311

P.3d 184, 194 (Cal. 2013) (unconscionability refers to "an absence of meaningful choice on the

part of one of the parties together with contract terms which are unreasonably favorable to the

other party").

### a. Intuit's Contract of Adhesion is Procedurally Unconscionable.

Intuit argues that placing arbitration provisions in form contracts of adhesion does not

render them procedurally unconscionable, (Mot. 14), a claim this Court rejected in *Fimby-*

*Christensen v. 24 Hour Fitness USA, Inc.*, by finding that the mere fact that an agreement "is

"adhesive… fulfills the requirement for procedural unconscionability under California law."  No.

5:13-cv-01007-EJD, 2013 U.S. Dist. LEXIS 166647, at *8 (N.D. Cal. Nov. 22, 2013) (Davila, J.)

(citing *Little v. Auto Stiegler, Inc.*, 63 P.3d 979 (Cal. 2003)); *see also Aral v. Earthlink, Inc.*, 35

Cal. Rptr. 3d 229 (Ct. App. 2005) (describing as "quintessential procedural unconscionability" a

contract in which "the terms of the agreement were presented on a 'take or leave it' basis either

through installation of the software or through materials included in the package mailed with the

software with no opportunity to opt out.").

Intuit cannot dispute that the Customer Plaintiffs were each presented with Agreements that bluntly warned:  "If you do not agree to this Agreement, then you may not use the Services." (Co. Decl. II, Ex. 5, at 1; *see also* Co. Decl. II, Ex. 10 at 1 (same referring to TTD).)  Nor can Intuit dispute that as a "national corporation," it is "without doubt the party of stronger bargaining strength, if not the party with *all* of the bargaining strength in this scenario."  *Antonelli v. Finish Line, Inc.*, No. 5:11-cv-03874 EJD, 2012 U.S. Dist. LEXIS 19787, at *10 (N.D. Cal. Feb. 16, 2012) (Davila, J.).  Intuit's take-it-or-leave-it language, coupled with Intuit's unquestionably superior bargaining position, leave no doubt that the arbitration provision is procedurally unconscionable.

### b.  Intuit's Arbitration Provision is Substantively Unconscionable.

The overwhelming procedural unconscionability here means a lesser showing of substantive unconscionability is required to establish that the arbitration provision is unenforceable.  *Armendariz v. Found. Health Psychcare Servs., Inc.*, 6 P.3d 669, 690 (Cal. 2000). Intuit's "class action waiver is… procedurally unconscionable because the inability to opt out of the provision constitutes unfair surprise, and substantively unconscionable because the ensuing waiver of Plaintiff's class action rights constitutes overly harsh results."  *Gerton v. Fortiss, LLC*, No. 15-cv-04805-TEH, 2016 U.S. Dist. LEXIS 19297, at *15 (N.D. Cal. Feb. 16, 2016).  This inherently one-sided provision coupled with the overwhelming procedural unconscionability present establishes that unconscionability permeates the entire arbitration provision.  The Court should accordingly refuse to enforce the arbitration provision.  Cal. Civ. Code § 1670.5; *Armendariz*, 6 P.3d at 695.

### C.  Even if Any of the Customer Plaintiffs' Claims Were Compelled to Arbitration, Their Remaining Claims Should Not Be Stayed.

For the reasons stated above, none of the Customer Plaintiffs' claims are subject to arbitration.  Moreover, even if the Court were to decide otherwise with respect to certain claims, it would still be proper to allow these Customer Plaintiffs' remaining claims to proceed before this Court, alongside the claims of the remaining Plaintiffs whose claims Intuit has not sought to stay or compel to arbitration.

1    Intuit's string-cite of authority stands only for the unremarkable proposition that it is

2    appropriate to stay a case with respect to a plaintiff when *all* of that plaintiff's claims are subject

3    to arbitration.  Where some of a plaintiff's claims are not subject to arbitration, however, the

4    Ninth Circuit has cautioned that "[e]xpanding the stay, so as to encompass all of the nonarbitrable

5    claims in the case, is only appropriate where the arbitrable claims predominate, or where the

6    outcome of the nonarbitrable claims will depend upon the arbitrator's decision." *United*

7    *Commc'ns Hub, Inc. v. Qwest Commc'ns, Inc.*, 46 F. App'x 412, 415 (9th Cir. 2002) (expressing

8    "a preference for proceeding with the non-arbitrable claims when feasible.").  Where non-

9    arbitrable claims remain pending before the Court, "the heavy presumption should be that the

10   arbitration and the lawsuit will each proceed in its normal course." *Dean Witter Reynolds, Inc. v.*

11   *Byrd*, 470 U.S. 213, 225 (1985) (White, J., concurring).

12   Here, to the extent any of the Customer Plaintiffs' claims were subject to arbitration, they

13   would not predominate over non-arbitrable claims.  Intuit has not sought to stay or compel to

14   arbitration the claims asserted by three of the eight named Plaintiffs, whose claims will proceed in

15   full before this Court.  Adjudication of those claims, as well as any of the Customer Plaintiffs'

16   claims not compelled to arbitration, would not depend upon any arbitrator's decision.  Indeed,

17   because it is entirely speculative whether an arbitration proceeding could generate findings that

18   would bind this Court, *see Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1321 (9th Cir. 1992)

19   (preclusive effect can only be determined following "an examination of the [arbitration] record, if

20   one exists, including any findings of the arbitrators"), it cannot be said that any potential

21   arbitration would affect the claims pending before this Court in any way.  Finally, any concerns

22   regarding efficiency should not be misconstrued to deprive the Customer Plaintiffs of the

23   opportunity to have the Court resolve their non-arbitrable claims.  *See Global Live Events - In*

24   *Liquidation v. Ja-Tail Enters., LLC*, No. CV 13-8293 SVW, 2014 U.S. Dist. LEXIS 63963, at *7

25   (C.D. Cal. May 8, 2014).

26                                  **CONCLUSION**

27   For the foregoing reasons, the Court should deny Intuit's partial motion to compel

28   arbitration.

1   Dated:  March 11, 2016          Respectfully submitted,

2                                   LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

3
                                    By:  ___/s/ Michael W. Sobol_____
4
                                       Michael W. Sobol (msobol@lchb.com)
5                                      Roger N. Heller (rheller@lchb.com)
                                       Melissa A. Gardner (mgardner@lchb.com)
6                                      275 Battery Street, 29th Floor
                                       San Francisco, CA 94111
7                                      415.956.1000

8
9   Dated:  March 11, 2016          ABBOTT LAW GROUP P.A.

10                                  By:  ___/s/ Steven W. Teppler_____

11                                     Steven W. Teppler (steppler@abbottlawpa.com)
                                       2929 Plummer Cove Road
12                                     Jacksonville, FL  32223
                                       904.292.1111
13

14  Dated:  March 11, 2016          GOLDMAN SCARLATO & PENNY, P.C

15
16                                  By:  ___/s/ Mark S. Goldman_____

17                                     Mark S. Goldman (goldman@lawgsp.com)
                                       Paul J. Scarlato (scarlato@lawgsp.com)
18                                     Brian Douglas Penny (penny@lawgsp.com)
                                       Eight Tower Bridge
19                                     161 Washington Street, Suite 1025
                                       Conshohocken, PA  19428
20                                     484.342.0700

21
    Dated:  March 11, 2016          MILBERG LLP
22

23                                  By:  ___/s/ Ariana J. Tadler_____

24                                     Ariana J. Tadler (atadler@milberg.com)
                                       Andrei Rado (arado@milberg.com)
25                                     Carey Alexander (calexander@milberg.com)
                                       One Pennsylvania Plaza, 49th Floor
26                                     New York, NY  10119
                                       212.946.9453
27

28

PLFS' MEMO IN OPPOSITION TO MOTION TO
                                                 COMPEL ARBITRATION; 15-CV-1778-EJD-PSG

1

Dated:  March 11, 2016                    SIPRUT, PC

2

3                                          By:     /s/ Joseph J Siprut

4                                              Joseph J Siprut (jsiprut@siprut.com)
                                              Michael Loren Silverman (msilverman@siprut.com)
5                                              17 North State Street, Suite 1600
                                              Chicago, IL 60602
6                                              312.236.0000

7                                          AHDOOT & WOLFSON, P.C.

8                                              Tina Wolfson (twolfson@ahdootwolfson.com)
                                              Ted Maya (tmaya@ahdootwolfson.com)
9                                              1016 Palm Avenue
                                              West Hollywood, CA 90069
10                                             310.474.9111

11                                         BERMAN DEVALERIO

12                                             Todd Anthony Seaver (tseaver@bermandevalerio.com)
                                              One California Street, Suite 900
13                                             San Francisco, CA 94111
                                              415.433.3200

14                                         GUSTAFSON GLUEK PLLC

15                                             Daniel E. Gustafson (dgustafson@gustafsongluek.com)
                                              Daniel C. Hedlund (dhedlund@gustafsongluek.com)
16                                             Eric S. Taubel (etaubel@gustafsongluek.com)
                                              Canadian Pacific Plaza
17                                             120 South 6th Street, Suite 2600
                                              Minneapolis, MN 55402
18                                             612.333.8844

19                                         HAMMONDLAW, PC

20                                             Julian Ari Hammond (jhammond@hammondlawpc.com)
                                              1180 S. Beverly Drive, Suite 601
21                                             Los Angeles, CA 90035
                                              310.601.6766
22
                                              Polina Pecherskaya (ppecherskaya@hammondlawpc.com)
23                                             Ari Nathan Cherniak (acherniak@hammondlawpc.com)
                                              1829 Reisterstown Road, Suite 410
24                                             Baltimore, MD 21208
                                              310.601.6766
25

26

27

28

PLFS' MEMO IN OPPOSITION TO MOTION TO
                                          COMPEL ARBITRATION; 15-CV-1778-EJD-PSG

1

2

JONES WARD PLC

3
Jasper Ward (jasper@jonesward.com)
312 South Fourth Street, 6th Floor
Louisville, KY 40202
502.882.6000

4

5
LAW OFFICES OF PAUL WHALEN PC

6
Paul C. Whalen
768 Plandome Road
Manhasset, NY 11030
516.627.5610

7

8
LITE DEPALMA GREENBERG LLC

9
Katrina Carroll (kcarroll@litedepalma.com)
Kyle Alan Shamberg (kshamberg@litedepalma.com)
211 W. Wacker Drive, Suite 500
Chicago, IL 60606
312.750.1265

10

11

12
MCCUNE WRIGHT LLP

13
Richard D. McCune (rdm@mccunewright.com)
2068 Orange Tree Lane, Suite 216
Redlands, CA 92374
909.557.1250

14

15

16
MORGAN AND MORGAN, P.A.

17
John A. Yanchunis (jyanchunis@forthepeople.com)
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
813.275.5272

18

19
RHINE LAW FIRM, P.C

20
Joel R. Rhine (jrr@rhinelawfirm.com)
1612 Military Cutoff Road, Suite 300
Wilmington, NC 28403
910.777.7651

21

22

23
*Attorneys for Plaintiffs and the Proposed Class*

24

25

26

27

28

PLFS' MEMO IN OPPOSITION TO MOTION TO
COMPEL ARBITRATION; 15-CV-1778-EJD-PSG