UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CHRISTINE DIAZ, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>INTUIT, INC.,<br><br>    Defendant. | Case No. 5:15-cv-01778-EJD<br><br>**ORDER GRANTING MOTION TO COMPEL ARBITRATION**<br><br>Re: Dkt. Nos. 75 |

I. INTRODUCTION

In this putative class action suit, six individual Plaintiffs[1] allege that Defendant Intuit, Inc. ("Intuit"), knowingly allowed fraudsters to open fake accounts and file fraudulent federal and state tax returns through Intuit's TurboTax tax preparation software. Intuit moves to compel four of the named plaintiffs, Carol Knoch ("Knoch"), James Lebinski ("Lebinski"), David Stock ("Stock") and Marilyn Williams ("Williams"), to arbitrate their claims pursuant to the Federal Arbitration Act ("FAA") and to stay these Plaintiffs' cases pending resolution of their respective arbitrations. Plaintiffs contend that the arbitration provisions they agreed to do not manifest a clear and unmistakable delegation to arbitrate the issue of arbitrability, and therefore the Court, and not the arbitrator, should decide arbitrability. The Court finds it appropriate to take the motion under submission for decision without oral argument pursuant to Civil Local Rule 7-1(b). For the reasons set forth below, Intuit's motion to compel arbitration is GRANTED.

---

[1] Two of the original eight named plaintiffs filed voluntary dismissals.

CASE NO.: 5:15-CV-01778-EJD
ORDER GRANTING MOTION TO COMPEL ARBITRATION

1

## II. BACKGROUND

Intuit develops and offers various financial and tax preparation software and related services, including TurboTax, a tax preparation software program. TurboTax can be utilized online or it can be downloaded and installed on a customer's personal computer. Inuit charges persons who file tax returns through TurboTax a "tax preparation fee" generally between approximately $50 and $150, in addition to other fees.

Plaintiffs allege that Intuit has known for years that fraudsters exploit Intuit's lax security in order to open fraudulent accounts with Intuit and file numerous fraudulent tax returns through TurboTax in other peoples' names. Intuit allegedly allows the fraud to occur through TurboTax in two ways: (a) Stolen Identity Refund Fraud ("SIRF"), where a fraudster gathers data about a taxpayer from outside means, such as the black market or "phishing," creates a fraudulent, new TurboTax account in the victim's name, and files a fraudulent tax return in the victim's name through TurboTax; and (b) Account Takeover Refund Fraud ("ATO"), where a fraudster hacks into an existing TurboTax account and files a fraudulent return in the victim's name through TurboTax.

Intuit allegedly knew that it was allowing SIRF and ATO fraud to occur through TurboTax, and that its allegedly lax security protocols were enabling and assisting the fraud. An internal Intuit strategy presentation allegedly showed that the number of "suspicious" customers who successfully filed a return using TurboTax was approximately 900,000 in 2010 and 2.5 million in 2012. In 2015, Intuit's Chief Information Security Officer allegedly stated in an interview with KrebsOnSecurity.com that about 40% of the tax returns flagged as likely fraudulent by Intuit were the result of ATOs and 60% appeared to be the result of SIRFs.

Intuit also allegedly knew that the risk of fraud perpetrated through TurboTax was continuing to increase as the number of major external "data breaches" increased, exposing the personal identifying information of millions of Americans to would-be fraudsters. Despite

CASE NO.: 5:15-CV-01778-EJD
ORDER GRANTING MOTION TO COMPEL ARBITRATION

2

knowledge of widely reported data breaches involving identify theft, and knowledge of SIRF and ATO fraud, Intuit allegedly maintained lax security protocols in order to boost its revenues.

Fox example, Intuit allegedly placed few requirements on individuals seeking to open accounts with Intuit and file tax returns using TurboTax. Further, Intuit allegedly eliminated one important protection it previously had in place —multi-step authentication—despite its security benefits. Plaintiffs allege on information and belief that Intuit dropped multi-step authentication in order to make it more convenient to open new accounts and to file returns through TurboTax, thereby generating more revenue for Intuit. Intuit also allegedly allowed the re-use of the same Social Security number across numerous TurboTax accounts, and failed to apply reasonable limits to the number of tax returns that could be filed from the same account and/or the same mailing address. Intuit also allegedly permitted tax filers to file state tax returns through TurboTax without filing a corresponding federal return, an option which allegedly is recognized in the industry as facilitating the filing of fraudulent state returns and is not offered by Intuit's competitors.

Intuit also allegedly enabled and assisted fraudulent filings through a policy of allowing TurboTax "tax preparation fees" to be paid out of tax refund proceeds. This option allegedly enabled fraudsters to file fraudulent returns through TurboTax without making any financial outlay. For TurboTax filers who opted to pay "tax preparation fees" out of refund proceeds, Intuit charged an additional "refund processing fee" of approximately $35.

Intuit also allegedly enabled and assisted fraudulent filings through its policy of allowing filers to receive tax refunds in non-traceable forms, such as pre-loaded debit cards or "Green Dot" cards. As another example, Intuit allegedly enabled and assisted fraud by failing to notify and timely notify consumers when fraudulent tax returns and/or tax returns that Intuit deemed suspicious were filed in their names, and by failing to timely notify the relevant tax authorities when tax returns deemed suspicious by Intuit were filed through TurboTax. Intuit allegedly made a deliberate and knowing decision to maintain the protocols described above in order to generate

CASE NO.: 5:15-CV-01778-EJD
ORDER GRANTING MOTION TO COMPEL ARBITRATION

3

revenue and market share. Plaintiffs allege that Intuit's desire to maximize fee revenue cause it to ignore the recommendations of its own security experts, Robert Lee and Shane MacDougall.

Plaintiffs allege that they were the victims of SIRF fraud, "meaning that Intuit allowed a fake TurboTax account to be opened in their names and allowed fraudulent tax returns to be filed from that account in their names." SCAC at ¶¶88, 98, 108, 115, 124, 133, 142, 152. Plaintiffs assert claims for unfair competition, negligence, aiding and abetting fraud, "negligent enablement of third party imposter fraud," and unjust enrichment.

## III. DISCUSSION

Plaintiffs Knoch, Lebinski, Stock and Williams agreed to the TurboTax online Terms of Service or the TurboTax desktop End User License Agreement, both of which contain a dispute resolution and class waiver provision. The dispute resolution provisions provide that "ANY DISPUTE OR CLAIM RELATING IN ANY WAY TO THE SERVICES OR THIS AGREEMENT WILL BE RESOLVED BY BINDING ARBITRATION, RATHER THAN IN COURT." Co Decl., Ex. 2 (emphasis in original). The dispute resolution provisions also specify that the Federal Arbitration Act ("FAA") governs the interpretation and enforcement of the arbitration provision.

The FAA provides that written agreements to arbitration disputes "shall be valid, irrevocable and enforceable, save upon grounds as exist at law or equity for the revocation of any contract." 9 U.S.C. §2. "By its terms, the Act 'leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.'" Chiron Corp. v. Ortho Diagnostic Sys., Inc., 207 F.3d 1126, 1130 (9th Cir. 2000) (quoting Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 218 (1985). A court must determine two "gateway" issues when deciding whether to compel arbitration: (1) whether there is an agreement to arbitration; and (2) whether the agreement covers the dispute. Brennan v. Opus Bank, 796 F.3d 1125, 1130 (9th Cir. 2015). Parties can also agree to arbitrate the "gateway" issues. Rent-A-Center, West, Inc. v.

CASE NO.: 5:15-CV-01778-EJD
ORDER GRANTING MOTION TO COMPEL ARBITRATION

4

Jackson, 561 U.S. 63, 68-69 (2010). In cases where the parties agree to arbitrate arbitrability, a court's inquiry is limited to whether the assertion of arbitrability is "wholly groundless." Qualcomm Inc. v. Nokia Corp., 466 F.3d 1366, 1371 (Fed. Cir. 2006) (applying Ninth Circuit law).

In the present case, the parties' dispute resolution agreements expressly provide that arbitration will be conducted by the American Arbitration Association ("AAA") before a single AAA arbitrator under the AAA's rules. Rule 14(a) of the AAA empowers the arbitrator "to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." Virtually every circuit has determined that incorporation of the AAA arbitration rules "constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." Zenelaj v. Handybook, Inc., 82 F.Supp.3d 968, 972 (N.D. Cal. 2015) (quoting Oracle America, Inc. v. Myriad Group A.G., 724 F.3d 1069, 1074 (9th Cir. 2013)).

Plaintiffs oppose arbitration, asserting that courts within the Ninth Circuit are split as to whether a reference to AAA rules clearly and unmistakably delegates the issue of arbitrability to an arbitrator when the parties to the arbitration agreement are not sophisticated parties. This is not so. Two of the three cases relied upon by Plaintiffs, predate Brennan v. Opus Bank, 796 F.3d 1125, 1130 (9th Cir. 2015), in which the Ninth Circuit stated, "[o]ur holding today should not be interpreted to require that the contracting parties be sophisticated or that the contract be 'commercial' before a court may conclude that incorporation of the AAA rules constitutes 'clear and unmistakable' evidence of the parties' intent" to arbitrate arbitrability. Furthermore, both before and after Brennan, courts in this district have consistently found that the reference to AAA rules evinces a clear and unmistakable intent to delegate arbitrability to an arbitrator, regardless of the sophistication of the parties. See e.g. Khraibut v. Chahal, 2016 WL 1070662 (N.D. Cal. 2016) (CRB); Galen v. Redfin Corp., 2015 WL 7734137 (N.D. Cal. 2015) (TEH); Levin v. Caviar, Inc., 2016 WL 270619 (N.D. Cal. 2016) (EDL); Accentcare Inc. v. Echevarria, 2015 WL 3465761

CASE NO.: 5:15-CV-01778-EJD
ORDER GRANTING MOTION TO COMPEL ARBITRATION

5

(N.D. Cal. 2015) (JSW). District courts outside of the Northern District of California but within the Ninth Circuit have also held that incorporation of AAA rules constitutes clear and unmistakable evidence of intent to arbitrate arbitrability, regardless of the sophistication of the parties. See Accentcare, 2015 WL 3465761 at *3 (cases collected). Consistent with the authorities cited above, the Court finds that the reference to the AAA rules constitutes clear and unmistakable evidence of the intent to arbitrate arbitrability.

Despite the delegation to arbitrate arbitrability, Knoch, Lebinski, Stock and Williams next ask the Court to conduct a "limited" inquiry to determine whether the assertion of arbitrability is "wholly groundless." Zenelaj, 82 F.Supp.3d at 975. In the present case, the arbitration clause is broad, applying to "ANY DISPUTE OR CLAIM RELATING IN ANY WAY TO THE SERVICES OR THIS AGREEMENT." Therefore, the Court does not find that the assertion of arbitrability is "wholly groundless."

## V. CONCLUSION

For the reasons set forth above, Intuit's motion to compel Plaintiffs Knoch, Lebinski, Stock and Williams to arbitration is GRANTED, and their cases are STAYED pending resolution of their respective arbitrations.

**IT IS SO ORDERED.**

Dated: September 29, 2017

EDWARD J. DAVILA
United States District Judge

CASE NO.: 5:15-CV-01778-EJD
ORDER GRANTING MOTION TO COMPEL ARBITRATION

6