1   Michael W. Sobol (SBN 194857)
    msobol@lchb.com
2   LIEFF CABRASER HEIMANN &
    BERNSTEIN, LLP
3   275 Battery Street, 29th Floor
    San Francisco, CA 94111-3339
4   Telephone: 415.956.1000

5   Steven W. Teppler (*pro hac vice*)
    steppler@abbottlawpa.com
6   ABBOTT LAW GROUP, P.A.
    2929 Plummer Cove Road
7   Jacksonville, FL 32223
    Telephone: 904.292.1111
8
    Joseph J. Siprut (*pro hac vice*)
9   jsiprut@siprut.com
    SIPRUT, PC
10  17 North State Street, Suite 1600
    Chicago, IL 60602
11  Telephone: 312.236.0000

    Ariana J. Tadler (*pro hac vice*)
    atadler@milberg.com
    MILBERG, LLP
    One Pennsylvania Plaza, 49th Floor
    New York, NY 10119
    Telephone: 212.946.9453

    Mark S. Goldman (*pro hac vice*)
    goldman@lawgsp.com
    GOLDMAN SCARLATO & PENNY, P.C.
    Eight Tower Bridge
    161 Washington Street, Suite 1025
    Conshohocken, PA 19428
    Telephone: 484.342.0700

    *Attorneys for Plaintiffs and the Proposed Class*
    *Additional Counsel listed on Signature Page*

12              IN THE UNITED STATES DISTRICT COURT

13              FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15  IN RE INTUIT DATA LITIGATION          Master Docket No. 15-CV-1778-EJD

16  _____           **THIRD CONSOLIDATED AMENDED
                                          COMPLAINT**
    THIS DOCUMENT RELATES TO:
17                                            **CLASS ACTION**
    **ALL ACTIONS**
18                                            **JURY TRIAL DEMANDED**

19

20

21

22

23

24

25

26

27

28

## THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

In accordance with the Court's Order Granting in Part and Denying in Part Motion to Dismiss (Dkt No. 124), and stipulated Order Continuing the Deadline for Plaintiffs to File an Amended Complaint (Dkt. No. 126), Plaintiffs file this Third Consolidated Amended Complaint, alleging, based on personal knowledge, investigation of their counsel, and information and belief, as follows:

## INTRODUCTION

1. This class action challenges Defendant Intuit, Inc.'s ("Intuit") conduct in knowingly allowing, enabling, and encouraging the opening of fake accounts and filing of fraudulent federal and state tax returns through its TurboTax tax preparation software. Potentially millions of innocent consumers have been affected by Intuit's conduct alleged herein.

2. For years, Intuit has knowingly maintained lax authentication and security protocols that fall below industry standards, allowing fraudsters to easily open fake TurboTax accounts and file fraudulent tax returns through TurboTax in innocent taxpayers' names. Further, Intuit has affirmatively adopted and implemented numerous policies and practices that Intuit knew encouraged and enabled fraudsters to open fake TurboTax accounts and file fraudulent tax returns through TurboTax in innocent taxpayers' names.

3. Intuit's corporate philosophy appears to have been that it was completely acceptable (if not beneficial to Intuit's interests) for this massive fraudulent conduct to occur through TurboTax every year, because Intuit feared the alternative—i.e., not implementing the problematic policies and practices, and fixing the deficient protocols—might cause "business" (legitimate and fraudulent) to be lost to Intuit's competitors.

4. Intuit knew that its deficient protocols and its policies and practices were encouraging and enabling this fraud in large numbers each year, but deliberately chose not to adopt appropriate measures to stop this from occurring, and, to the contrary, made the deliberate choice to continue to implement its numerous problematic affirmative policies and practices that encouraged and enabled the fraud. Intuit made the knowing choice to sacrifice security and facilitate fraudulent conduct in order to make it more convenient for accounts to be opened and

for returns (fraudulent and otherwise) to be filed through TurboTax and thereby generate massive additional fee revenue for Intuit.

5.    By its conduct alleged herein, Intuit has reaped at least many millions of dollars in improper fees, including "tax preparation fees" and "refund processing fees" that it assessed in connection with fraudulent filings through TurboTax. Intuit's conduct has also resulted in, and substantially facilitated, the theft of hundreds of millions of dollars (if not more) from federal and state governments.

6.    Intuit's conduct has caused significant harm to Plaintiffs and the proposed Class members. Among other harms, as a result of Intuit's conduct, Plaintiffs and the proposed Class members have incurred, and will continue to incur, out-of-pocket expenses (including but not limited to fees paid to tax professionals and for credit monitoring and identity theft protection services), have had their legitimate tax refunds delayed, including in years of the filing of the fraudulent returns in their names, and in following years, as they became ineligible to e-file their tax returns due to Intuit's conduct, have incurred considerable inconvenience and frustration and expended significant time dealing with the ramifications of Intuit's conduct, and are at an increased, actual, imminent risk of identity theft and other fraud going forward.

7.    Through its knowing, reckless, willful and negligent conduct alleged herein, Intuit violated California's Unfair Competition Law, Bus. & Prof. Code §§ 17200, *et seq*. Intuit's conduct alleged herein also constitutes negligence and aiding and abetting fraud.

8.    Plaintiffs bring this action, on behalf of themselves and the proposed Class, for damages, restitution, disgorgement of Intuit's ill-gotten gains, and other equitable relief and other relief as stated herein, including an injunction requiring Intuit to discontinue its improper affirmative policies and practices that encouraged and enabled the fraud, and to implement appropriate authentication and security protocols to protect Plaintiffs, the proposed Class, and the public at large.

# THE PARTIES

9.      Defendant Intuit, Inc. ("Intuit") is headquartered in Mountain View, California, and incorporated under the laws of the State of Delaware.  Intuit markets, sells and operates TurboTax, a tax preparation and filing software product and service.

10.     Plaintiff Richard Brown is a resident and citizen of Hanover, Pennsylvania.

11.     Plaintiff Christine Diaz is a resident and citizen of Avon, Ohio.

12.     Plaintiff Carol Knoch is a resident and citizen of Joliet, Illinois.[1]

13.     Plaintiff James Lebinski is a resident and citizen of Monroe, Connecticut.

14.     Plaintiff David Stock is a resident and citizen of Baltimore, Maryland.

15.     Plaintiff Marilyn Williams is a resident and citizen of Upper Marlboro, Maryland.

# JURISDICTION & VENUE

16.     This Court has subject matter jurisdiction over this putative class action pursuant to 28 U.S.C. § 1332(d), because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and some members of the putative Class are citizens of states different than Intuit.

17.     This Court has personal jurisdiction over Intuit because Intuit's corporate headquarters are in California, Intuit conducts substantial business in California, and Intuit purposefully placed its tax preparation and filing products and services into the stream of commerce within California and throughout the United States.

18.     Venue properly lies in this District pursuant to 28 U.S.C. § 1391(b)(1) because Intuit is headquartered in this District, and a substantial part of the events and omissions giving rise to the claims alleged herein occurred within this District.  On information and belief, all or a substantial portion of the development of TurboTax software application, Intuit's authentication

---

[1] By order dated September 29, 2017, the Court compelled four of the Plaintiffs (Carol Knoch, James Lebinski, David Stock, and Marilyn Williams) to arbitrate the issue of whether their claims are subject to arbitration. Dkt. No. 123.  Plaintiffs have filed a motion for permission to seek interlocutory appellate review of that order.  Dkt. No. 127.  Plaintiffs Knoch, Lebinski, Stock, and Williams continue to respectfully preserve any and all rights they may have to pursue their claims and relief in this Court and on appeal.

and security protocols, and Intuit's affirmative policies and practices alleged herein took place within this District, in Mountain View, California.

## INTRADISTRICT ASSIGNMENT

19.     Assignment to this Division is appropriate under Civil Local Rule 3-2 because Intuit is headquartered in Santa Clara County, within the San Jose Division of this District.

## COMMON FACTUAL ALLEGATIONS

### I.     Intuit and TurboTax Software

20.     Intuit is a U.S.-based software company that develops and sells financial and tax preparation software and related services.  At the close of the 2016 fiscal year, Intuit had a market capitalization of over $39 billion, $4.7 billion in annual revenue, and approximately 8,000 employees.

21.     At all relevant times, Intuit has owned, manufactured, promoted, sold, and operated TurboTax, one of the most widely-used tax preparation products in the United States. TurboTax has a particularly large share of the market for electronic "self" tax preparation and e-filing.

22.     For the 2009 tax year, approximately 144 million federal tax returns were filed; 95 million of those were e-filed, and approximately 34% of e-filed returns were self-prepared.[2]  For the 2015 tax year, approximately 151 million federal tax returns were filed; nearly 129 million of those were e-filed, and close to 40% of those were self-prepared.[3]  Of the approximately 50 million "self-prepared" federal tax returns filed in 2015,[4] an estimated 91% were prepared electronically using tax preparation software.[5]  On information and belief, approximately 29 million individuals used TurboTax software to file tax returns in 2015 alone.

---

[2] Internal Revenue Service, *2010 Filing Season Statistics,* https://www.irs.gov/newsroom/2010-filing-season-statistics (last visited Nov. 16, 2017).
[3] Internal Revenue Service, *Filing Season Statistics for Week Ending Dec. 25, 2015,* https://www.irs.gov/newsroom/filing-season-statistics-for-week-ending-december-25-2015 (last visited Nov. 16, 2017).
[4] *Id.*
[5] Internal Revenue Service, *More than 122 Million Returns E-Filed in 2013,* http://www.irs.gov/uac/More-than-122-million-Returns-eFiled-in-2013 (last visited Nov. 16, 2017).

23.     TurboTax software can be utilized online, at www.turbotax.com, or it can be downloaded and installed on a customer's personal computer (called "desktop" software).  Intuit creates new, distinct versions of TurboTax software (online and desktop versions) for at least each tax year.

24.     Intuit charges persons who file tax returns through TurboTax a "tax preparation fee" (generally between approximately $50 and $150), in addition to other fees, including as described below.  Intuit receives and keeps fees even in instances where returns filed through TurboTax are fraudulent.  On information and belief, Intuit has received at least many millions of dollars in tax preparation and other fees in connection with fraudulent returns filed through TurboTax.

## II.     Intuit Knowingly Allowed Fake Accounts to Be Opened and Fraudulent Returns to be Filed Through TurboTax.

25.     Intuit has known for years that fraudsters exploit Intuit's lax security and fraudster-friendly policies and practices in order to open fraudulent accounts with Intuit and file numerous fraudulent tax returns through TurboTax in others peoples' names.  Indeed, this is and has been common knowledge in the industry.

26.     Specifically, Intuit has allowed fraud to occur through TurboTax in two ways:

a.      Stolen Identity Refund Fraud ("SIRF"), where a fraudster gathers pieces of data about a taxpayer from outside means (e.g., through the black market or "phishing"), creates a fraudulent, new TurboTax account in the victim's name, and then easily files a fraudulent tax return in the victim's name through TurboTax; and

b.      Account Takeover Refund Fraud ("ATO"), where a fraudster hacks into an existing TurboTax account and easily files a fraudulent return in the victim's name through TurboTax.

27.     Intuit knew that it was allowing SIRF and ATO fraud to occur through TurboTax in large numbers each year, and that its lax security protocols and affirmative policies and practices were enabling and assisting this fraud.

28.     For example, ███████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████

29.     Similarly, an internal Intuit strategy presentation reportedly obtained by the Washington Post showed that the number of "suspicious" customers who successfully filed a return using TurboTax was approximately 900,000 in 2010, and that by 2012, that number had grown to approximately 2.5 million.[6]  Records produced by Intuit to date[7] indicate that ██
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████████

30.     In a February 2015 interview with the computer security and cybercrime blog KrebsOnSecurity.com, Intuit's Chief Information Security Officer reportedly stated that about 40% of the returns flagged as likely fraudulent by Intuit were the result of ATOs, while the remaining 60% appeared to be via SIRFs.

31.     Intuit also knew that the risk of such fraud was continuing to increase as the number of major external "data breaches" continued to pile up, exposing the personal identifying information (or "PII") of many millions of Americans to fraudsters.  In recent years, there have been numerous widely-reported data breaches, including breaches that were publicized before and during the 2015 filing season (i.e., for Tax Year 2014 returns).  For example:

---

[6] Jonnelle Marte and Craig Timberg, *Who's to Blame When Fraudsters Use TurboTax to Steal Refunds?*, Wash. Post (Mar. 4, 2015), http://www.washingtonpost.com/news/get-there/wp/2015/03/04/unprecedented-surge-in-online-tax-scams-raises-questions-about-turbotax/ (last visited Nov. 16, 2017).

[7] Plaintiffs note that discovery, including Intuit's production of documents in this case, is ongoing and is expected to shed further light on the issues alleged in this Complaint.

a.  In January 2014, Target Corporation confirmed that the names, mailing addresses, phone numbers, email addresses, and payment information of up to 110 million customers had been obtained by hackers.[8]

b.  In summer 2014, JPMorgan Chase confirmed that the names, email and mailing addresses, and phone numbers of account holders had been obtained by hackers, in a breach that affected 76 million households and 7 million small businesses.[9]

c.  In late 2014, Home Depot confirmed that files containing approximately 53 million email addresses were stolen, and approximately 56 million credit and debit cards were compromised by hackers.[10]

d.  In December 2014, Sony Pictures Entertainment confirmed that the names, mailing addresses, Social Security numbers and financial information of its employees and their families, as well as emails between employees and information about executive salaries at the company, had been obtained by hackers.[11] Forty-seven thousand of these stolen Social Security numbers subsequently appeared more than 1.1 million times on 601 publicly-posted files.[12]

e.  In February 2015, health insurer Anthem, Inc. announced that the names, birth dates, Social Security numbers, health care ID numbers, home addresses, email addresses, and employment information, including income

---

[8] Elizabeth Harris and Nicole Perlroth, *For Target, the Breach Numbers Grow*, N.Y. Times (Jan. 10, 2014), http://www.nytimes.com/2014/01/11/business/target-breach-affected-70-million-customers.html (last visited Nov. 16, 2017).

[9] Dominic Rushe, *JP Morgan Chase Reveals Massive Data Breach Affecting 76m Households*, The Guardian (Oct.3, 2014), http://www.theguardian.com/business/2014/oct/02/jp-morgan-76m-households-affected-data-breach (last visited Nov. 16, 2017).

[10] Robin Sidel, *Home Depot's 56 Million Card Breach Bigger than Target's*, Wall St. J. (Sept. 18, 2014), http://www.wsj.com/articles/home-depot-breach-bigger-than-targets-1411073571 (last visited Nov. 16, 2017).

[11] Sony Pictures, *Letter to Sony Pictures Entertainment Employees* (Dec. 8, 2014), http://oag.ca.gov/system/files/12%2008%2014%20letter_0.pdf (last visited Nov. 16, 2017).

[12] Identity Finder, *Identity Finder Research Uncovers Depth of Sony Breach* (Dec. 5, 2014), https://www.prnewswire.com/news-releases/identity-finder-research-uncovers-depth-of-sony-breach-300005443.html (last visited Nov. 16, 2017).

data, of approximately 80 million people had been exposed in a data breach.[13]

        f.       In March 2015, health insurer Premera Blue Cross confirmed that claims data, including clinical information, along with banking account numbers, Social Security numbers, birth dates, and other data of 11 million customers had been compromised by hackers.[14]

32.      Major data breaches, and access to consumers' PII by fraudsters, were by no means a new phenomenon in 2015. For example, in 2013, the IRS publicly announced that the use of an individual's PII to commit tax fraud, such as to file a fraudulent tax return, was the most common scam that taxpayers could encounter during the year.[15]

33.      In the years leading up to the filing of this litigation, the U.S. Department of Justice ("DOJ") issued dozens of press releases concerning the use of taxpayers' PII to fraudulently claim tax refunds in the names of victims.[16]

34.      The Federal Trade Commission ("FTC") reports that in 2014, it received 332,646 consumer complaints specifically reporting incidents of identity theft—more than any other consumer complaint category, including debt collection.[17] The largest portion of these identity theft complaints was specifically related to tax identity thefts.[18]

---

[13] Tim Evans, *Anthem Data Breach*, USA Today (Feb. 5, 2015), http://www.usatoday.com/story/tech/2015/02/05/anthem-data-breach-protect-customers/22934777/ (last visited Nov. 16, 2017).

[14] Reuters, *Premera Blue Cross Says Data Breach Exposed Medical Data* (Mar. 27, 2015), http://www.nytimes.com/2015/03/18/business/premera-blue-cross-says-data-breach-exposed-medical-data.html (last visited Nov. 16, 2017).

[15] Internal Revenue Service, *IRS Releases the Dirty Dozen Tax Scams for 2013*, http://www.irs.gov/uac/Newsroom/IRS-Releases-the-Dirty-Dozen-Tax-Scams-for-2013 (last visited Nov. 16, 2017).

[16] Department of Justice, *Stolen Identity Refund Fraud Press Releases*, http://www.justice.gov/tax/stolen-identity-refund-fraud-press-releases (last visited Nov. 16, 2017).

[17] Federal Trade Commission, *Consumer Sentinel Network Data Book for January-December 2014*, https://www.ftc.gov/system/files/documents/reports/consumer-sentinel-network-data-book-january-december-2014/sentinel-cy2014-1.pdf, at 5 (last visited Nov. 16, 2017).

[18] *Id.*, at 6.

35.     As a major market player in the tax preparation and e-filing industry, and from its extensive first-hand knowledge of the SIRF and ATO fraud it was allowing to occur through TurboTax itself, Intuit was well aware of the existence and continuing nature of these risks.

**III.    Intuit Deliberately Maintained Lax Security Protocols, and Implemented Policies and Practices That it Knew Enabled and Encouraged Tax Identity Fraud, In Order to Boost Its Own Revenues.**

36.     Even as the numbers of fraudulent TurboTax accounts and fraudulent tax filings through TurboTax continued to pile up, and the instances of major data breaches continued to grow, Intuit deliberately maintained deficient protocols that it knew enabled the fraud. ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ █████████████████████████  Following this overarching approach, Intuit made a series of choices that have made it particularly easy for fraudsters to create false TurboTax accounts and file fraudulent returns in others' names.  In some cases, Intuit's lax protocols have resulted in ████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████████

37.     At all relevant times, Intuit has placed few requirements on individuals, including fraudsters, seeking to open accounts with Intuit and file tax returns using TurboTax.  The TurboTax website has made clear that TurboTax is an ideal mechanism for fraudulent filing, stating, for example, that the only information needed to file a tax return includes "Social Security numbers and dates of birth for you, your spouse, and your dependents."[19]  Intuit advertised that on TurboTax, "[y]ou don't really need anything but your email address to get started! . . . You don't even need to have your W–2s or 1099s, we can import that information directly from more than a million participating employers and financial institutions."[20]

38.     Indeed, Intuit deliberately chose *not* implement basic, fundamental security

---

[19] Intuit TurboTax, *Tax Preparation Checklist*, https://turbotax.intuit.com/tax-tools/tax-tips/Tax-Planning-and-Checklists/Tax-Preparation-Checklist/INF12048.html; https://web.archive.org/web/20150323112059/https://turbotax.intuit.com/tax-tools/tax-tips/Tax-Planning-and-Checklists/Tax-Preparation-Checklist/INF12048.html (last visited Nov. 16, 2017).
[20] Intuit TurboTax, *Frequently Asked Questions*, https://turbotax.intuit.com/best-tax-software/common-questions.jsp (last visited Nov. 16, 2017).

measures that were suggested by its own experts and by others. 

39.

40.

41.

42.

_____
[21]



43.

44.

45.

46.     Rather than fix its authentication and security protocols in the face of the objective information that it had, Intuit actually *eliminated* one important protection it previously had in place—multi-step authentication—despite that measure's clear security benefits.  Intuit dropped multi-step authentication in order to make it more convenient to open new accounts and file returns (fraudulent and otherwise) through TurboTax and thereby generate more revenue for

Intuit. 

47.     Among other additional deficiencies in its protocols, Intuit allowed the re-use of the same Social Security number across numerous TurboTax accounts, and failed to apply reasonable limits to the number of tax returns that could be filed from the same account and/or the same mailing address.  Intuit lacked adequate protocols to ensure that persons opening TurboTax accounts were not imposters.  For example, where fraudsters sought to open new TurboTax accounts for identities or Social Security numbers for which a TurboTax account already existed, Intuit did not apply adequate authentication and security protocols to prevent those fake accounts from being opened.

48.     Intuit further enabled and assisted the fraud by failing

49.

50.     In addition to maintaining knowingly deficient security protocols, Intuit also deliberately adopted and implemented numerous other affirmative policies and practices which Intuit knew encouraged and enabled fraudsters to engage in SIRF and ATO through TurboTax on a massive scale.

51.     For example, until at least 2015, Intuit permitted filers to file state tax returns through TurboTax without filing a corresponding federal return (called "untethered state returns")—an option not offered by competitors of TurboTax and one that is recognized in the industry as facilitating the filing of fraudulent state returns.

52.     Intuit knew that its policy of permitting untethered state tax returns  was particularly attractive to fraudsters

53.     Intuit also enabled and assisted the fraud through its policy of allowing TurboTax "tax preparation fees" to be paid out of tax refund proceeds.  Specifically, Intuit gives TurboTax filers (including fraudsters) the option to have the tax preparation fees deducted from the tax refund proceeds associated with the return in question, rather than paying the fees up front at the time of filing.  This option encouraged and significantly contributed to the fraud by making it possible for fraudsters to attempt to file fraudulent returns through TurboTax (in fact, as many attempts as they want) without making any financial outlay.  For TurboTax filers (including fraudsters) who opt to pay the tax preparation fees out of the refund proceeds, Intuit assesses an additional "refund processing fee" (approximately $34.99).[22]

54.     Intuit also enabled and assisted the fraud through its policy of broadly permitting, without any limitations or control mechanism, multiple tax refund payments to be delivered to the same bank account.  A

---

[22] Intuit TurboTax, *TurboTax FAQ: What is the Refund Processing Service?*, https://ttlc.intuit.com/questions/1900596-what-is-the-refund-processing-service; https://web.archive.org/web/20150930105946/https://ttlc.intuit.com/questions/1900596-what-is-the-refund-processing-service (last visited Nov. 16, 2017).

[REDACTED]

55.    Intuit has also enabled and assisted the fraud through its policy of allowing filers (including fraudsters) to receive tax refunds in non-traceable forms, such as pre-loaded debit cards or "Green Dot" cards.  Utah State Tax Commission Chairman John Valentine explained in testimony to the U.S. Senate Finance Committee that 'once the funds are transferred to such cards, they cannot easily be traced or recovered, a perfect vehicle to commit fraud."

Mr. Valentine also stated that "prepaid debit cards appear to be preferable to fraudsters because the identity thief doesn't have to bother with banks, credit unions or check-cashing stores that may become suspicious when one person starts bringing in multiple tax refund checks to be cashed or deposited."[23]

56.    [REDACTED]

---

[23] Krebs on Security, *Tax Fraud Advice, Straight from the Scammers* (March 25, 2015), http://krebsonsecurity.com/2015/03/tax-fraud-advice-straight-from-the-scammers/ (last visited Nov. 16, 2017).

57. Intuit also enabled and assisted the fraud by failing to notify and timely notify consumers when fraudulent tax returns and/or tax returns that Intuit deemed "suspicious" were filed in their names, and by failing to timely notify the relevant tax authorities when tax returns deemed "suspicious" by Intuit are filed through TurboTax.

58. Intuit also enabled and assisted the fraud by failing

59. Intuit's deficient protocols and its policies and practices that encourage and enable the fraud are not an accident. Rather, Intuit has made the deliberate and knowing decision to maintain and implement these deficient protocols and these policies and practices despite the known and foreseeable harm they cause to innocent taxpayers and to federal and state governments. Intuit chose to sacrifice security in order to make the opening of new accounts and

the filing of tax returns through TurboTax (fraudulent and otherwise) more convenient, thereby generating additional fee revenue and market share for Intuit.

60.     Intuit retains "tax preparation" fees and "refund processing fees" that it receives whether the corresponding tax returns filed through TurboTax are fraudulent or legitimate.

61.     Thus, for example, where fraudsters opt to deduct the TurboTax tax preparation fee from refund proceeds, and Intuit receives such fee (and the additional refund processing fee) after the tax return is accepted and the tax refund is paid, Intuit keeps those fees.[24] If the IRS or relevant state tax agency determines *after* making such refund payment that the tax return was fraudulent, then, on information and belief, the agency does not seek reimbursement from Intuit for the fees Intuit received, out of the refund, for that return. On information and belief, if the IRS or relevant state tax agency determines that a tax return was fraudulent *prior* to paying the refund, and rejects the tax return, then Intuit sends a bill for its fees to the individual in whose name the rejected tax return was submitted—i.e., the victim of the fraud—which in some instances the victims may pay (in which case Intuit retains the fees). Because, however, such victims are generally unlikely to pay bills for fraudulently-filed tax returns or such bills may be sent to fraudsters who will not pay them, Intuit has a financial incentive to maximize the number of fraudulent returns that are accepted, and paid, by the tax authority to which they are submitted.

62.     Where a fraudster pays the tax preparation fee up front (on information and belief, in the less frequent scenario where this occurs, the payment is generally made using a stolen credit card), Intuit at least in some instances retains the fees received even when the corresponding tax return is fraudulent, and whether or not the return is ultimately accepted or rejected by the relevant tax authority.[25]

---

[24] Intuit TurboTax, *TurboTax FAQ: What is the Refund Processing Service?*, https://ttlc.intuit.com/questions/1900596-what-is-the-refund-processing-service; https://web.archive.org/web/20150930105946/https://ttlc.intuit.com/questions/1900596-what-is-the-refund-processing-service (last visited Nov. 16, 2017).

[25] Intuit TurboTax, *TurboTax FAQ: Can I get a refund of the e-filing fee if my TurboTax Online return is rejected?*, https://ttlc.intuit.com/questions/1901176-can-i-get-a-refund-of-the-e-filing-fee-if-my-turbotax-online-return-is-rejected (last visited Nov. 16, 2017).

63.     Moreover, if a taxpayer who has been the victim of a fraudulent filing later attempts to file a legitimate tax return through TurboTax (i.e., before discovering the fraud), Intuit charges him or her a tax preparation fee even though his or her tax return will subsequently be rejected because a fraudulent return had already been filed using his or her identity.[26]  On information and belief, once TurboTax collects fees from such consumers, those fees are non-refundable.

64.     On information and belief, yet another of Intuit's policies that enabled and assisted fraudulent filings was Intuit's policy to impose an unnecessary three-week delay between Intuit's internal determination that a tax return was "suspicious," and its reporting of those suspicions to the IRS.[27]  Three weeks is approximately the amount of time it takes the IRS to process a return and issue a refund for an e-filed return.[28]  This delay increases the likelihood that, if a fraudulent tax return is filed through TurboTax, the fraud will not be discovered by the relevant tax authority until *after* Intuit receives its fees associated with that return.

65.     In total, Intuit has received at least many millions of dollars in fees in connection with fraudulent filings through TurboTax during the relevant time period.  At all relevant times, Intuit thus has had a strong financial incentive: to "look the other way" as fraudsters exploit its lax security and other fraud-encouraging policies and practices to easily carry out their fraud; to maintain protocols and policies that enable and contribute to the easy opening of fraudulent accounts with Intuit and the filing of fraudulent returns through TurboTax; and to refrain from adopting reasonable and appropriate protocols that would prevent the fraud from occurring.

66.     As explained by the commissioner of the Alabama Department of Revenue, discussing the large number of fraudulent tax returns filed using TurboTax, "[c]ommercial tax preparation software vendors [like Intuit] are driven by profit. . . . The easier they make it to file a

---

[26] Some of these individuals presumably are also charged for the purchase of TurboTax software.

[27] Krebs On Security, *TurboTax's Anti-Fraud Efforts Under Scrutiny* (Feb. 15, 2015) http://krebsonsecurity.com/2015/02/turbotaxs-anti-fraud-efforts-under-scrutiny/ (last visited Nov. 16, 2017).

[28] *Id.*

return, the more customers they can get and the more profitable they will become. There is no incentive for them to stop fraud."[29]

67.     Intuit repeatedly refused to undertake security policies or procedures that would impact its customers' use of TurboTax—regardless of the dire need for those security policies or procedures to prevent fraudulent tax returns.

68.     As just one example, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

69.     Intuit concealed from consumers and the public at large the massive extent of fraudulent tax filings through TurboTax, ████████████████████████████████████████████████████████████████████████████████████████████

70.     Intuit's desire to maximize its fee revenue caused it to ignore the recommendations of its own security experts regarding protocol and policy changes that were needed to stop the fraud.

71.     In mid-2015, two former Intuit employees reported that Intuit had made millions of dollars in illicit fee revenue by knowingly processing tax returns filed by fraudsters and by deliberately failing to implement security measures that would have prevented the fraud.

72.     Robert Lee, who worked as a security business partner in Intuit's consumer tax group until July 2014, said in an interview with KrebsOnSecurity.com that he and his team developed sophisticated models for identifying and closing accounts that were being used to commit tax refund fraud, but Intuit refused to adopt them.[30]  As Mr. Lee explained: "If I sign up for an account and file tax refund requests on 100 people who are not me, it's obviously

---

[29] Jonnelle Marte and Craig Timberg, *Who's to Blame When Fraudsters Use TurboTax to Steal Refunds?*, Wash. Post (Mar. 4, 2015), http://www.washingtonpost.com/news/get-there/wp/2015/03/04/unprecedented-surge-in-online-tax-scams-raises-questions-about-turbotax/ (last visited Nov. 16, 2017).

[30] KrebsOnSecurity, *TurboTax's Anti-Fraud Efforts Under Scrutiny* (Feb. 15, 2015) http://krebsonsecurity.com/2015/02/turbotaxs-anti-fraud-efforts-under-scrutiny/ (last visited Nov. 16, 2017).

fraud . . . . We found literally millions of accounts that were 100% used only for fraud.  But [Intuit] management explicitly forbade us from either flagging the accounts as fraudulent, or turning off those accounts."[31]  The protocols that were recommended to Intuit but that Intuit rejected, according to Mr. Lee, included blocking the re-use of the same Social Security number across a certain number of TurboTax accounts, and preventing the same account from filing more than a small number of tax returns.[32]

73.     Shane MacDougall, a security engineer at Intuit until February 2015, also described Intuit's refusal to implement adequate security protocols.  Mr. MacDougall filed an official whistleblower complaint with the U.S. Securities and Exchange Commission describing Intuit's decision to reject preventive security measures for e-filings and, instead, to facilitate fraudsters' efforts to commit fraud using TurboTax.[33]  According to KrebsOnSecurity.com, Mr. MacDougall's whistleblower complaint alleges that Intuit systematically prioritized profits over ethics when it came to its processing of fraudulent tax filings.[34]  According to Mr. MacDougall, he repeatedly raised issues with Intuit executives about trying to curb ongoing tax fraud occurring through TurboTax, but was continuously rebuffed and told that Intuit would not do anything that would "hurt the numbers."[35]

74.     Rather than improve its deficient protocols, Intuit executives have attempted to rationalize that if they improved security at TurboTax, fraudsters would take their business elsewhere.  For example, Intuit deputy general counsel, Michael Lyons, stated: "As you can imagine, the bad guys being smart and savvy, they saw [Intuit's previous measures to prevent fraudulent e-filings] and noticed it, they just went somewhere else . . . . The amount of fraudulent activity didn't change.  The landscape didn't change.  It was like squeezing a balloon.  They recognized that TurboTax returns were getting stopped at the door.  So they said, 'We'll just go over to H&R Block, to TaxSlayer or TaxAct, or whatever.'  And all of a sudden we saw what we

---

[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.*

call 'multi-filer activity' [at Intuit] had completely dropped off a cliff but the amount that the IRS reported coming through digital channels and through their self-reported fraud network was not changing at all. The bad guys had just gone from us to others."[36]

75.     Similarly, David Williams, Intuit's chief tax officer, stated: "If any one company, ours or any other company, decided to take a whole bunch of actions that would 100% determine that every single one of their customers was exactly who they said they were, that would not stop fraud in the industry . . . . It would just push the fraud around. It would squeeze the balloon."[37]

76.     Intuit's lax security protocols and fraudster-friendly policies and practices have made TurboTax the overwhelming vehicle of choice for filing fraudulent returns, even after adjusting for Intuit's large market share.

77.     Tax Year 2014 saw a sharp increase in fraudulent state tax refund filings.[38] On information and belief, and as described below, the vast majority of this fraud occurred through TurboTax.

78.     In early February 2015, as tax season began to get underway, Intuit was forced to temporarily suspend state e-filings when it received notice from multiple states about a major uptick in suspicious filings. Even then, Intuit failed to notify affected persons that fraudulent and "suspicious" tax returns had been filed in their names. A February 6, 2015 *Wall Street Journal* article noted that aside from TurboTax, "[n]o other providers have yet been identified as a source of fraudulent state e-filed returns."[39] The article further quoted a spokesman from TurboTax competitor, H&R Block, who said "H&R Block has no indication of similar problems with its state tax filings. H&R Block continues to file state and federal returns as usual." A spokesman

---

[36] *Id.*

[37] Jonnelle Marte and Craig Timberg, *Who's to Blame When Fraudsters Use TurboTax to Steal Refunds?*, Wash. Post (Mar. 4, 2015), http://www.washingtonpost.com/news/get-there/wp/2015/03/04/unprecedented-surge-in-online-tax-scams-raises-questions-about-turbotax/ (last visited Nov. 16, 2017).

[38] KrebsOnSecurity, *The Rise in State Tax Refund Fraud* (Feb. 15, 2015), http://krebsonsecurity.com/2015/02/the-rise-in-state-tax-refund-fraud/ (last visited Nov. 16, 2017).

[39] Laura Sanders, *TurboTax Halts State E-Filing Amid Data-Breach Probe*, Wall St. J. (Feb. 6, 2015), http://blogs.wsj.com/totalreturn/2015/02/06/turbotax-halts-e-filing-of-state-tax-returns/ (last visited Nov. 16, 2017).

for another TurboTax competitor, TaxAct, likewise stated that it was not seeing fraud issues similar to TurboTax.[40]

79.    According to the Utah Tax Commission, as of February 2015, nineteen states had identified a significant number of suspicious e-filed tax returns for Tax Year 2014.[41]  Utah tax officials announced that all of the potentially fraudulent tax returns identified in the state had been filed through TurboTax.[42]

80.    On February 13, 2015, Intuit announced that it had finally re-implemented a multi-step authentication process, a basic security measure commonly employed by websites including social media providers.

81.    Given, *inter alia*, Intuit's knowledge that it allowed large numbers of fraudulent accounts to be opened and fraudulent returns to be filed through TurboTax each year; its knowledge that its own lax protocols and fraudster-friendly policies and practices were enabling and assisting the fraud; its knowledge that there were available measures that it could have taken to address the fraud (including measures that its own security personnel were recommending and that its competitors had adopted); its knowledge of the continuing and increasing risk of SIRF and ATO fraud; given that Intuit is in the business of filing of income tax returns and was thus in a unique position of power, responsibility, information, and trust; given Intuit's position as a dominant player in the tax preparation and e-filing industry; and given its knowledge that consumers did not have the pertinent information that Intuit had and could not sufficiently monitor or protect themselves against the risk of false account openings and fraudulent filings through TurboTax, Intuit owed a duty of care to the Plaintiffs and the proposed Class members. Any of the above factors, alone, would have created a duty of reasonable care.  Together, the duty of care owed by Intuit is particularly evident and strong.

82.    The duty of care that Intuit owed Plaintiffs and the proposed Class members included, among other things: the duty to maintain reasonable authentication and security

---

[40] *Id.*
[41] *Id.*
[42] *Id.*

protocols to prevent the opening of fraudulent accounts in Plaintiffs' and Class members' names and the filing of fraudulent tax returns through TurboTax in their names; the duty to maintain policies and practices that did not encourage fraudsters to carry out this fraud through TurboTax; the duty to maintain reasonable protocols to ensure that persons filing tax returns through TurboTax were so authorized and were not imposters; the duty to notify and timely notify them if an when fraudulent tax returns and/or tax returns that Intuit deemed "suspicious" were filed in their names through TurboTax; and the duty to notify and timely notify relevant tax agencies of tax returns filed through TurboTax that were fraudulent or suspicious.

83.     To the extent Intuit may have been limited in any way in its ability to withhold the filing of tax returns that it allowed to be prepared using TurboTax software, including those it deemed suspicious, then in particular given its knowledge of the ongoing and increasing occurrence and risk of tax fraud, Intuit had a duty to maintain reasonable authentication and security protocols regarding the opening of new TurboTax accounts, including but not limited to where TurboTax accounts were sought to be opened for identities and Social Security numbers for which TurboTax accounts already existed, and to maintain policies and practices that did not encourage fraudsters to carry out this fraud through TurboTax.

84.     Intuit's particular role, as a business engaged in filing tens of millions of income tax returns each year, and allowing tax returns to be filed in Plaintiffs' and the Class members' names through TurboTax, created a duty and responsibility for Intuit to Plaintiffs and the Class members that was fiduciary both in nature and spirit.

85.     Intuit breached its duties to the Plaintiffs and the proposed Class through its conduct alleged herein, including by, *inter alia*, maintaining deficient authentication and security protocols, implementing policies and practices which Intuit knew greatly encouraged and enabled SIRF and ATO, maintaining protocols that failed to ensure that persons opening accounts and filing tax returns through TurboTax were so authorized and were not imposters, failing to provide notice and timely notice of fraudulent and "suspicious" tax returns filed in their names through TurboTax, and failing to notify and/or unreasonably delaying notifying relevant tax agencies of tax returns filed through TurboTax that were fraudulent or suspicious.

86.     Intuit's conduct alleged herein was negligent, reckless, knowing, and willful.

87.     Intuit, through its conduct alleged herein, assisted, aided and substantially contributed to fraudsters' perpetration of tax fraud on Plaintiffs and the proposed Class.

88.     Intuit knew that this fraud was occurring (both SIRF and ATO) on a massive scale every year through TurboTax, and further had information and had the capability, and/or would have had the capability but for its deliberate choice not to utilize available means, to detect, notify the would-be victims, and prevent the specific instances of this fraud from occurring through TurboTax.

89.     Intuit intentionally aided and assisted in the fraud in order to bolster its own fee revenue. Intuit substantially contributed to the perpetration of fraud on Plaintiffs and the Class. Indeed, Intuit's affirmative policies and practices which enabled and encouraged the fraud— including but by no means limited to its policies of allowing TurboTax fees to be paid from refund proceeds, and for refunds to be paid by non-traceable means—were critical to fraudsters being able to perpetrate the fraud. But for Intuit's deficient protocols and its policies and practices that encouraged and enabled the fraud, the fraudsters certainly would not have been able to carry out this fraud on anything close to the same scale that they have now done for years.

90.     Had Intuit maintained and utilized appropriate authentication, security, notification, and other protocols, it would have been able to detect, identify, and prevent fraud that occurred with respect to Plaintiffs and the proposed Class.

91.     On information and belief, Intuit maintained an internal system to identify "suspicious" tax filings. This internal system was inadequate and/or was not properly utilized to detect, identify, and prevent fraud, including as to Plaintiffs and the Class members.

92.     As a result of Intuit's conduct alleged herein, Plaintiffs and the proposed Class members have been harmed. Among other things, as a result of Intuit's conduct, Plaintiffs and the proposed Class members have incurred, and will continue to incur, out-of-pocket expenses (including but not limited to fees paid to tax professionals and for credit monitoring and identity theft protection services), have had their legitimate tax refunds delayed, including in years of the filing of the fraudulent returns in their names, and in following years, as they became ineligible to

e-file their tax returns due to Intuit's conduct,[43] have incurred considerable inconvenience and frustration and incurred significant time dealing with the ramifications of Intuit's conduct, and are at an actual, imminent, increased risk of identity theft and other fraud going forward.

93. The harm that Plaintiffs and the Class members have suffered and will suffer, as alleged herein, were foreseeable results of Intuit's conduct alleged herein. Intuit knew or should have known that its conduct would cause such harm. Intuit knew that its conduct was enabling and assisting in the opening of fraudulent accounts and the filing of fraudulent returns in consumers' names through TurboTax on a massive scale each year and, particularly given its position as a large player in the tax preparation and e-filing industry and through complaints it received from victims, was aware of and/or should have been aware of the types of harm that befell victims of tax fraud.

94. Had Intuit timely notified Plaintiffs and the proposed Class about the fraud, they could have taken steps to prevent or limit the harm they suffered.

95. Had Intuit timely notified the relevant tax authorities about fraudulent and "suspicious" tax filings through TurboTax, harm to Plaintiffs and the proposed Class could have been prevented or limited.

96. Intuit has been unjustly enriched by its conduct alleged herein, including through its receipt and retention of millions of dollars in ill-gotten fees.

**IV.** **Santa Barbara Bank & Trust**

97. In carrying out the misconduct alleged herein, Intuit has utilized and relied upon the services of financial institution Santa Barbara Tax Products Group (alternatively referred to as Santa Barbara Bank & Trust) (hereinafter, "SBBT"). Pursuant to an arrangement between Intuit and SBBT, where filers (fraudulent and otherwise) opt to pay their TurboTax tax preparation fees from the tax refund proceeds, the filer is required by Intuit to agree to have the refund in question issued to SBBT, which in turn allocates such proceeds between Intuit (i.e., Intuit's fees) and the

---

[43] Refunds for manually-filed returns take several months longer to be paid than refunds for e-filed returns.

filer.  On information and belief, SBBT receives compensation from Intuit for SBBT's role, ███

████████████████████████████████████████████████████████

98.     Intuit, through its arrangement with SBBT, facilitates the payment of improper tax refunds to fraudsters, including but not limited to allowing refund payments to be made to fraudsters by non-traceable means and in non-traceable forms.

99.     Intuit's security policies and protocols with respect to refund processing, including those policies and protocols that are carried out by SBBT, are knowingly deficient and enable the payment of refunds to fraudsters and enable and encourage the fraud.

## V.     Intuit's Terms of Service and End User License Agreement

100.    Each time a customer uses the TurboTax online software to prepare and file a tax return, he or she is required by Intuit to click a button indicating their "agreement" that such use of the software will be governed by the then-applicable iteration of the TurboTax Online Terms of Service ("TOS").

101.    Each time a customer installs TurboTax desktop software on their computer (which installed software, in turn, can be used to prepare and file tax returns for a single, specified year), he or she is required by Intuit to click a button indicating their "agreement" that their installation and use of that software will be governed by the then-applicable iteration of the TurboTax End User License Agreement ("EULA").

102.    By Intuit's design, online TurboTax customers enter into a new TOS each time they utilize the online TurboTax software to prepare and file tax return(s).  Likewise, by Intuit's design, TurboTax desktop customers enter into a new EULA each time they go through the process of installing a version of the desktop software on their computer.  The applicable TOS or EULA terms, in turn, are specific to the corresponding use (in the case of the online software) or software download (in the case of the desktop software).

103.    Intuit has made certain changes to the TOS and EULA over the years.  Thus, for example, if a customer used TurboTax's online software to file their returns in 2012 and 2013, they would have been required by Intuit to "agree" to a separate TOS in connection with each such use, the terms of which may have changed between the two years.

104.     As alleged herein, Intuit allowed fraudsters to open new accounts and file fraudulent tax returns through TurboTax in the names of the Plaintiffs and the proposed Class members.  In utilizing TurboTax software for those ends, a fraudster was necessarily required to click a button, and thereby enter into his or her own TOS or EULA with Intuit governing his or her particular download/use of the software.  For fraudsters using the TurboTax online software, each time they used the software to file a fraudulent return, they entered into a new TOS with Intuit with respect to that use.  Likewise, for fraudsters who used the TurboTax desktop software to file a fraudulent return, when they went through the process of downloading and installing the software on their computer(s) (i.e., the download that they used to file the fraudulent return), they entered into a EULA with Intuit governing that use.

105.     The fraudsters, and not the Plaintiffs or proposed Class members, thus clicked a button agreeing to any TOS or EULA "contracts" potentially governing any conduct and claims at issue in this complaint.  To the extent any such TOS or EULA applies to or governs the software downloads/uses at issue, or the claims, in this case, it would be contracts between Intuit and the fraudsters, not between Intuit and the Plaintiffs or Class members, regardless of whether some Plaintiffs or Class members entered into other TOSs or EULAs (in prior years, after the fraud occurred, or otherwise) governing their entirely separate, legitimate uses of the software.

106.     Thus, neither the TOSs/EULAs entered into by any of the Plaintiffs or Class members (for those who ever did), nor any of the terms thereof, including the dispute resolution provisions, apply to or govern the claims alleged herein.

107.     Even if the dispute resolution provision of the TOS or EULA were applicable to any of the claims alleged herein (which they are not), such provision would be unenforceable in any event.  Among other things, such provision is procedurally unconscionable—including, but not limited to, because the "agreements" in which it resides are form adhesion contracts, drafted by Intuit which has superior bargaining power, and are presented to consumers on a take-it-or-leave-it basis—and is also substantively unconscionable and unfairly one-sided.

**FACTS PERTAINING TO PLAINTIFFS**

**I.    Richard Brown**

108.    Plaintiff Richard Brown has never been a TurboTax customer.  He has never utilized TurboTax or purchased TurboTax software.  At no time has he ever provided information to TurboTax or authorized it to file any tax returns on his behalf.

109.    Intuit allowed fraudulent tax return(s) to be filed in Mr. Brown's name through TurboTax.  On information and belief, Mr. Brown was subject to SIRF fraud, meaning that Intuit allowed a fake TurboTax account to be opened in his name and allowed fraudulent tax returns to be filed from that account in his name through TurboTax.

110.    Intuit enabled and assisted, and could have prevented, this fraud.  Further discovery is expected to shed additional light on the circumstances regarding the fraudulent filings through TurboTax in Mr. Brown's name, but it is apparent that Intuit ████████ ████████████████████████████████████████████████████ Moreover, Intuit's policies alleged in this Complaint—including but not limited to the policies of allowing TurboTax fees to be paid from refund proceeds and for refunds to be paid in non-traceable forms—encouraged and otherwise enabled the fraud that beset Mr. Brown.

111.    While discovery is ongoing, certain materials produced by Intuit indicate as follows: ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████

112.    Based on the information Intuit had, it knew that the account opened in Mr. Brown's name and return filed through that account were fraudulent or at the least was highly likely to be fraudulent.  Further discovery is expected to shed additional light on this.

113.    The first time that Mr. Brown learned that anything was wrong was on or about March 2, 2015, when Mr. Brown's accountant informed him that he could not e-file Mr. Brown's 2014 federal tax return because a fraudulent 2014 federal tax return had already been filed using Mr. Brown's Social Security number.

114.    Mr. Brown thereafter learned that the fraudulent return filed using his Social Security number was filed through TurboTax.  On or about April 23, 2015, Mr. Brown received a bill from Intuit seeking $37.09 for "TURBOTAX ONLINE DELUXE TY2014 PREP."

115.    On or about April 24, 2015, Mr. Brown sent letters addressed to Intuit and the vice president of customer advocacy for TurboTax, Bob Meighan, explaining that he was the victim of tax fraud and asking for assistance tracking the IP address associated with the fraudulent tax return filed through TurboTax using his Social Security number.  Mr. Brown paid $20.77 out-of-pocket for postage for these mailings which were directly tied to the fraudulent filings through TurboTax in his name and were necessitated by Intuit's conduct.  In his letters, Mr. Brown recommended that Intuit eliminate its refund processing service so that it could use credit card data to further verify the identity of the individual paying to file a tax return.  Mr. Brown has yet to receive a response to either of his letters.

116.    Mr. Brown has incurred significant harm as result of Intuit's conduct alleged herein.  Among other things, Mr. Brown has incurred significant inconvenience and frustration, and has expended considerable time and resources dealing with the ramifications of the fraud. Moreover, to guard against further identity theft, Mr. Brown immediately sought to protect himself by purchasing identity theft and credit monitoring protection from Equifax, paying Equifax $29.95 per month.  Mr. Brown is still concerned about identity theft and would like to continue to receive identity protection, but could not afford to continue to pay $29.95 per month

indefinitely and discontinued the payments in December 2015.  Mr. Brown has additionally spent

hours contacting various government entities, including the IRS, the FTC, his local police

department, and his Congressman, Scott Perry.

117.    Because of Intuit's conduct alleged herein, Mr. Brown became ineligible to e-file

his tax returns, causing Mr. Brown hardship.

118.    Because of Intuit's conduct alleged herein, Mr. Brown is at a heightened risk of

further identity theft requiring him to pay for months of credit monitoring and to continue to

closely monitor his credit and financial accounts.

## II.    Christine Diaz

119.    In or about late 2010 or early 2011, Christine Diaz purchased TurboTax online

software to file her 2010 joint tax return with her husband.  Subsequently, Ms. Diaz and her

husband determined that the online version did not meet their needs, and she subsequently

purchased the Tax Year 2010 desktop version of TurboTax to file their 2010 joint tax return.

120.    In 2011, Ms. Diaz e-filed her 2010 Ohio State, and federal, tax returns using

TurboTax.

121.    Ms. Diaz has not utilized TurboTax or purchased any TurboTax software since

filing her joint tax returns in 2011.

122.    Intuit allowed fraudulent tax return(s) to be filed in Ms. Diaz's name through

TurboTax.  On information and belief, Ms. Diaz was subject to SIRF fraud, meaning that Intuit

allowed a fake TurboTax account to be opened in her name and allowed fraudulent tax returns to

be filed from that account in her name through TurboTax.

123.    Intuit enabled and assisted, and could have prevented, this fraud.  Further

discovery is expected to shed additional light on the circumstances regarding the fraudulent

filings through TurboTax in Ms. Diaz's name, but it is apparent that Intuit ████████████

███████████████████████████████████████.  Moreover, Intuit's policies alleged

in this Complaint—including but not limited to the policies of allowing TurboTax fees to be paid

from refund proceeds and for refunds to be paid in non-traceable forms—encouraged and

otherwise enabled the fraud that beset Ms. Diaz.

124.    While discovery is ongoing, certain materials produced by Intuit indicate as follows:



[black redaction bar]

125.    Based on the information Intuit had, it knew that the accounts opened in Ms Diaz's name and returns filed through those accounts were fraudulent or at the least were highly likely to be fraudulent.  Further discovery is expected to shed additional light on this.

126.    In or about January 2015, Ms. Diaz learned that fraudulent tax filings (Tax Year 2014) had been filed in her name with the federal government, as well as in Michigan, Missouri, Ohio, and Oklahoma.

127.    Ms. Diaz thereafter learned that the fraudulent returns filed in her name were filed through TurboTax.  In March 2015, approximately four years after Ms. Diaz had last utilized TurboTax, Ms. Diaz received a bill in the amount of $242.75 from Intuit for the e-filing in her name of Tax Year 2014 state tax returns in Michigan, Missouri, Ohio, and Oklahoma, and for filing a Tax Year 2014 federal home and business tax return.

128.    When Ms. Diaz learned of the multiple fraudulent filings, she had not yet submitted her tax returns for Tax Year 2014.

129.    On March 29, 2015, Ms. Diaz's husband called TurboTax customer support about the fraudulent e-filings.  He was advised only that the fraudulent filings were made on January 26, 2015.  Intuit refused to provide more information on the call, and advised Ms. Diaz's husband that someone from Intuit would be in contact with him.

130.    Intuit's customer calls records show that [black redaction bar] As of the date of this filing, no one from Intuit has contacted Ms. Diaz or her husband.

131.    Ms. Diaz has incurred significant harm as result of Intuit's conduct alleged herein. Among other things, she has incurred significant inconvenience and frustration.  Moreover,

Ms. Diaz and her husband have had to spend more than 35 hours dealing with the ramifications of the fraud.

132.     Because of Intuit's conduct alleged herein, Ms. Diaz became ineligible to e-file her tax returns.  Her 2014 state tax refund was delayed; she did not receive the refund check until the week of September 28, 2015, causing considerable hardship to her and her family.

133.     After learning of the fraudulent tax filings through TurboTax, Ms. Diaz and her family signed up for LifeLock credit monitoring at a cost of $20 per month.

134.     Because of Intuit's conduct alleged herein, Ms. Diaz is at a heightened risk of further identity theft.

**III.     Carol Knoch**

135.     Ms. Knoch used TurboTax to file her tax returns for approximately 12 years prior to and including Tax Year 2013.

136.     Intuit allowed fraudulent tax return(s) to be filed in Ms. Knoch's name through TurboTax.  On information and belief, Ms. Knoch was subject to SIRF fraud, meaning that Intuit allowed a fake TurboTax account to be opened in her name and allowed fraudulent tax returns to be filed from that account in her name through TurboTax.

137.     With respect to Ms. Knoch, Intuit has not yet produced any of its internal files regarding the fraudulent returns filed through TurboTax in her name.  It is expected that such files and further discovery will shed additional light on the circumstances regarding the fraudulent returns filed in Ms. Knoch's name.  Plaintiffs therefore reserve the right to seek leave to amend this complaint to add more detailed allegations regarding the circumstances of same.

138.     On March 2, 2015, Ms. Knoch received a refund check from the IRS in the amount of $7,942.  At the time she received this check, Ms. Knoch had not yet filed her 2014 tax returns, nor had she purchased or attempted to use TurboTax software to file her 2014 tax returns.

139.     On March 3, 2015, Ms. Knoch contacted TurboTax to inquire about the refund check that she had received.  Ms. Knoch learned that Intuit had allowed a fraudulent federal tax return (Tax Year 2014) to be e-filed through TurboTax in her name.  The representative specifically informed Ms. Knoch that the person whom Intuit allowed to file the return had

initially attempted to put the refund on a reloadable debit card but had been rejected by the IRS, resulting in the mailing of the physical check to Ms. Knoch's residence.

140.    Following this conversation, Ms. Knoch filed a police report with the Joliet, Illinois Police Department reporting the identity theft, contacted three credit bureaus to inform them that her identity had been stolen, and completed forms with the IRS in an attempt to clear her name. Ms. Knoch also signed up for credit monitoring through Equifax in an effort to protect herself against further identity theft and identity fraud.

141.    Ms. Knoch was ultimately forced to paper file her federal and state tax returns for Tax Year 2014. Ms. Knoch completed her returns through TurboTax but, because she could not e-file the returns due to the fraudulent filings Intuit had allowed to occur in her name, she was forced to pay approximately $10.00 in printing fees, out-of-pocket, for her paper returns. Ms. Knoch remains ineligible for e-filing her returns and must incur approximately $10.00 in printing fees, out-of-pocket, for each paper tax return she files. Ms. Knoch has not been reimbursed for this necessary expenditure.

142.    Ms. Knoch has spent considerable time monitoring her financial accounts as a result of her identity theft. For the first year after Intuit allowed a fraudulent tax return to be filed in her name, Ms. Knoch examined her financial accounts approximately three times a day. Ms. Knoch currently examines her financial accounts multiple times per month. Each time she examines her financial accounts, Ms. Knoch spends several minutes reviewing the activity that has occurred on the account.

143.    Ms. Knoch has incurred significant harm as result of Intuit's conduct alleged herein. Among other things, Ms. Knoch has incurred significant inconvenience and frustration, and has expended considerable time, including as described above.

144.    Because of Intuit's conduct alleged herein, Ms. Knoch became ineligible to e-file her tax returns, delaying any tax refund that she may receive for a significant period of time, and causing her hardship.

145.    Because of Intuit's conduct alleged herein, Ms. Knoch is at a heightened risk of further identity theft requiring her to obtain ongoing credit monitoring.

## IV.  James Lebinski

146.  Mr. Lebinski used TurboTax to file joint tax returns on behalf of himself and his wife for several years before and including Tax Year 2013.

147.  Intuit allowed fraudulent tax return(s) to be filed in Mr. Lebinski's name through TurboTax.  On information and belief, Mr. Lebinski was subject to SIRF fraud, meaning that Intuit allowed a fake TurboTax account to be opened in his name and allowed fraudulent tax returns to be filed from that account in his name through TurboTax.

148.  With respect to Mr. Lebinski, Intuit has not yet produced any of its internal files regarding the fraudulent returns filed through TurboTax in his name.  It is expected that such files and further discovery will shed additional light on the circumstances regarding the fraudulent returns filed in Mr. Lebinski's name.  Plaintiffs therefore reserve the right to seek leave to amend this complaint to add more detailed allegations regarding the circumstances of same.

149.  In early April 2015, Mr. Lebinski and his wife attempted to use TurboTax to file their 2014 federal and state tax returns.  At that time, Mr. Lebinski paid the TurboTax tax preparation fee, and attempted to e-file his returns through TurboTax.  Prior to that time, Mr. Lebinski had not purchased or attempted to use TurboTax software to file his 2014 tax returns.

150.  On April 14, 2015, Mr. Lebinski received an "error message" from TurboTax, indicating a problem with his attempted filing.  Mr. Lebinski called TurboTax customer service that night, stayed on the line for over two hours, but never got through to anyone.

151.  On April 15, 2015, Mr. Lebinski called TurboTax again.  Again, he had to endure a wait of over two hours before connecting with TurboTax representative Amanda Carter. Mr. Lebinski learned that day from Ms. Carter that Intuit had already allowed a new, false TurboTax account to be opened in his name and had allowed fraudulent tax returns (Tax Year 2014) to be filed in his name.  Specifically, Ms. Carter provided the following information to Mr. Lebinski:

| | |
|---|---|
| 1 | a. Intuit had allowed a new TurboTax account to be fraudulently opened in |
| 2 | his name, using his Social Security number, and his home address with a |
| 3 | slight mistake in the spelling of the street name; |
| 4 | b. Fraudsters had coupled Mr. Lebinski's personal information with the |
| 5 | information of another man, and used their information to file fraudulent |
| 6 | tax returns as same sex domestic partners through TurboTax (Tax Year |
| 7 | 2014); |
| 8 | c. A new email address was used for the fraudulent TurboTax account opened |
| 9 | in his name; |
| 10 | d. The new account fraudulently opened in his name did not include |
| 11 | Mr. Lebinski's wife or children; |
| 12 | e. In connection with filing fraudulent returns through TurboTax in his name, |
| 13 | fraudsters had already obtained refunds of between $1,000 and $5,000, |
| 14 | with those amounts being paid via untraceable reloadable cards. |

152. Mr. Lebinski has incurred significant harm as a result of Intuit's conduct alleged herein. In addition to the harm described above, Mr. Lebinski experienced a long, arduous process to obtain his 2014 tax refund from the state of Connecticut, which was thus delayed, and was forced to file a traditional paper return to obtain his federal tax refund, which was also significantly delayed.

153. Moreover, as a result of Intuit's conduct alleged herein, Mr. Lebinski has paid for his own, outside personal credit protection service, signed up for Credit Karma credit score monitoring, reported the fraud to TurboTax and credit monitoring companies, reported the fraud to his employer, filed fraud alerts, filed a police report, started the process of re-filing his tax returns, and changed all relevant passwords, among other protective actions. To date, Mr. Lebinski has spent approximately 200 hours dealing with the ramifications of this fraud.

154. In addition, Intuit charged Mr. Lebinski $111.08 for his attempted 2014 tax return e-filings through TurboTax, even though he could not e-file such returns through TurboTax because Intuit had already allowed fraudulent returns to be filed in his name.

THIRD CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
15-CV-1778-EJD

1  155.  Because of Intuit's conduct alleged herein, Mr. Lebinski is at a heightened risk of

2  further identity theft requiring him and his wife to pay indefinitely for ongoing credit monitoring.

3  **V.    David Stock**

4  156.  Plaintiff David Stock used TurboTax software to file his state and federal tax

5  returns for approximately seven or eight years prior to and including Tax Year 2013.

6  157.  Intuit allowed fraudulent tax return(s) to be filed in Mr. Stock's name through

7  TurboTax.  On information and belief, Mr. Stock was subject to SIRF fraud, meaning that Intuit

8  allowed a fake TurboTax account to be opened in his name and allowed fraudulent tax returns to

9  be filed from that account in his name through TurboTax.

10  158.  With respect to Mr. Stock, Intuit has not yet produced any of its internal files

11  regarding the fraudulent returns filed through TurboTax in his name.  It is expected that such files

12  and further discovery will shed additional light on the circumstances regarding the fraudulent

13  returns filed in Mr. Stock's name.  Plaintiffs therefore reserve the right to seek leave to amend

14  this complaint to add more detailed allegations regarding the circumstances of same.

15  159.  Mr. Stock decided to use TurboTax to file his 2014 tax returns.  On April 11,

16  2015, Mr. Stock purchased the TurboTax online software, "State MD TY2014 PREP" and

17  "DELUXETY2014 PREP," at a total cost of approximately $94.98.  Prior to that date, Mr. Stock

18  had not purchased or attempted to use TurboTax software to file his 2014 tax returns.

19  160.  On or about April 13, 2015, Mr. Stock logged into his TurboTax account and

20  completed his 2014 tax return forms.  Mr. Stock then clicked to e-file his tax return, but a pop-up

21  message appeared on his computer screen stating that a 2014 tax return had already been filed

22  using his Social Security number and that another tax return using his Social Security number

23  could not be filed.

24  161.  Mr. Stock then contacted Intuit to try to figure out what had happened.  An Intuit

25  representative advised Mr. Stock that Intuit had already allowed fraudulent state and federal tax

26  returns to be filed through TurboTax in his name, using a different email address from the one

27  used by Mr. Stock to register with TurboTax.  An Intuit representative advised Mr. Stock to

28

contact Maryland's state tax authorities and to file form 14039 with the IRS to alert the IRS about the fraudulent filing.

162.    Mr. Stock has incurred significant harm as a result of Intuit's conduct alleged herein.  Among other things, Mr. Stock has incurred considerable inconvenience and frustration, and has spent considerable time dealing with the ramifications of the fraud.  He spent many hours contacting Maryland State tax authorities, filing a police report, contacting the IRS, and hand delivering his state tax filings to the state Comptroller's Office in Annapolis, Maryland.  Moreover, his legitimate 2014 tax refund was delayed.  Mr. Stock has not received any further contact or information from Intuit as of the time of this filing.

163.    On or about April 13, 2015, Mr. Stock requested from Intuit a full refund of the purchase price that he paid for Tax Year 2014 TurboTax software, but Intuit refused to issue any refund.

164.    Instead, on or about April 13, 2015, Intuit sent an email to Mr. Stock in which Intuit stated, "[y]ou may be eligible for a $25 cash back offer, go to https://turbotax.intuit.com/25back." Mr. Stock has not claimed the supposed offer.

165.    As a result of Intuit's conduct alleged herein, Mr. Stock became ineligible to e-file his tax returns, delaying any tax refund that he may receive for a significant period of time, and causing Mr. Stock considerable hardship.

166.    Because of Intuit's conduct alleged herein, Mr. Stock is at a heightened risk of further identity theft.

## VI.    **Marilyn Williams**

167.    Plaintiff Marilyn Williams first purchased TurboTax software for use on her desktop in 2001, and the software automatically renewed each year thereafter for a fee. Ms. Williams used TurboTax to file her tax returns every year between 2001 and Tax Year 2013.

168.    Intuit allowed fraudulent tax return(s) to be filed in Ms. Williams's name through TurboTax.  On information and belief, Ms. Williams was subject to SIRF fraud, meaning that Intuit allowed a fake TurboTax account to be opened in her name and allowed fraudulent tax returns to be filed from that account in her name through TurboTax.

169. With respect to Ms. Williams, Intuit has not yet produced any of its internal files regarding the fraudulent returns filed through TurboTax in her name. It is expected that such files and further discovery will shed additional light on the circumstances regarding the fraudulent returns filed in Ms. Williams's name. Plaintiffs therefore reserve the right to seek leave to amend this complaint to add more detailed allegations regarding the circumstances of same.

170. On or around April 14, 2015, Ms. Williams attempted to e-file her 2014 tax returns through TurboTax, but she discovered that fraudulent tax returns had already been e-filed using her Social Security number. Prior to that date, Ms. Williams had not attempted to use TurboTax to file her 2014 tax returns.

171. On April 15, 2015, Ms. Williams contacted Intuit by telephone to try to figure out what had happened. On that date, a TurboTax representative denied that any fraudulent returns had been filed in her name through TurboTax. In fact, Intuit had already allowed a fraudulent federal tax return to be filed through TurboTax in her name, along with several additional fraudulent state tax returns, including for New York, Michigan, and Maryland.

172. On April 15, 2015, Ms. Williams called the IRS, which instructed her to file a paper federal tax return by mail and to include a tax fraud affidavit with proper documentation.

173. Also on April 15, 2015, Ms. Williams visited the Maryland Comptroller's Office in person. A Comptroller's Office representative confirmed that a filing had been made in Ms. Williams's name, on April 7, 2015. Ms. Williams was instructed to return the following day with her Maryland state tax documents, and she was told that Maryland would accept a paper tax return filing in person. Her Maryland state tax refund for Tax Year 2014 was delayed due to the fraudulent returns until approximately June 3, 2016, causing her harm.

174. Approximately one week after discovering that Intuit had allowed fraudulent tax returns to be filed in her name through TurboTax, Ms. Williams received in the mail a Walmart Money Card, in her husband's name. Approximately one week later, she received a second Walmart Money Card in her own name. Neither she nor her husband had applied for these cards.

175. To guard against further identity theft, Ms. Williams has formally notified the New York State Department of Taxation and Finance, the State of Michigan, the State of Maryland,

the FTC, the credit bureau Experian, and the IRS that she has been the victim of tax fraud. Moreover, Ms. Williams has purchased credit monitoring through ProtectMyID for herself, which she has automatically renewed each year since 2015 at a cost of $99.95 per year.

176.    Ms. Williams has incurred significant harm as a result of Intuit's conduct alleged herein.  In addition to the harm described above, Ms. Williams has incurred considerable inconvenience and frustration, and has expended considerable time and resources dealing with the ramifications of the fraud, including having to take April 15, 2015 and April 16, 2015 off work, filing her tax returns on paper rather than electronically each year since 2015, and being required to take additional security precautions by the state and federal tax authorities, including not being permitted to contact the IRS through their regular customer service line.

177.    As a result of Intuit's conduct alleged herein, Ms. Williams became ineligible to e-file her tax returns, delaying any tax refund that she may receive for a significant period of time, and causing Ms. Williams considerable hardship.  For example, having to file paper returns for the State of Maryland for Tax Years 2014 and 2015 caused her refunds to be significantly delayed.

178.    Because of Intuit's conduct alleged herein, Ms. Williams is at a heightened risk of further identity theft requiring her to pay indefinitely for ongoing credit monitoring.

## CLASS ALLEGATIONS

179.    Plaintiffs bring this nationwide class action, pursuant to Federal Rules of Civil Procedure, Rule 23(a), 23(b)(2), 23(b)(3), and 23(c)(4), individually and on behalf of all members of the following "Class":  All persons in the United States in whose names fraudulent tax returns were filed using TurboTax within the applicable statute of limitations.[44]

180.    Excluded from the Class are the following individuals and/or entities: Intuit, its affiliates, employees, officers and directors, any entity in which Intuit has a controlling interest, all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out, and all Judge(s) assigned to hear any aspect of this litigation, as well as their immediate family members.

[44] This Class may be divided into sub-classes.

181. Plaintiffs reserve the right to modify, change, or expand the definition of the Class.

182. The Class is so numerous that joinder of all members is impracticable. On information and belief, at least tens of thousands of persons, if not significantly more, have had fraudulent tax returns filed in their name through TurboTax. On information and belief, the number and identities of such persons are identifiable and ascertainable based upon available information, including Intuit's records and IRS and state tax authority records.

183. This case raises multiple common questions of law or fact, the answers to which will drive the resolution of this case, including but not limited to:

      a.      whether Intuit owed a duty of care to Plaintiffs and the Class members;

      b.      whether Intuit was negligent in its development and maintenance of its authentication and security protocols;

      c.      whether Intuit failed to implement reasonable protocols to prevent the opening of fake TurboTax accounts and/or the filing of fraudulent tax returns through TurboTax;

      d.      whether Intuit implemented affirmative policies and practices which encouraged and enabled tax identity fraud through TurboTax;

      e.      whether Intuit failed to implement appropriate policies regarding notifying affected victims of fraudulent tax filings through TurboTax;

      f.      whether Intuit's conduct alleged herein was knowing, reckless, willful, and/or intentional;

      g.      whether Intuit facilitated and/or substantially assisted in third-party fraud;

      h.      whether Intuit's conduct alleged herein violated the California UCL;

      i.      whether Intuit's conduct alleged herein constitutes common law negligence, and/or aiding and abetting fraud;

      j.      whether Plaintiffs and the Class members are entitled damages and/or restitution;

      k.      whether Intuit has been unjustly enriched by its conduct alleged herein;

1          l.      whether Intuit should be ordered to disgorge the money it received by its

2                  conduct alleged herein; and

3          m.      whether injunctive relief and/or declaratory relief should be entered.

4      184.    Plaintiffs' claims are typical of the claims of the Class.  Plaintiffs and all members

5  of the proposed Class were subject to the same alleged wrongful conduct by Intuit and all had

6  fraudulent tax returns filed in their names through TurboTax.  Plaintiffs are advancing the same

7  claims and legal theories on behalf of themselves and the Class, and have the same interest in

8  obtaining relief.

9      185.    Plaintiffs will adequately and fairly protect the interests of the Class.  Plaintiffs'

10  interests are aligned with, and do not conflict with, the interests of the Class members.  Moreover,

11  Plaintiffs have retained counsel competent and highly experienced in complex class action

12  litigation, and they intend to prosecute this action vigorously.  The interests of the Class will be

13  fairly and adequately protected by Plaintiffs and their counsel.

14      186.    A class action is superior to all other available means for the fair and efficient

15  adjudication of the claims of Plaintiffs and members of the Class.  The injury suffered by each

16  individual Class member is relatively small in comparison to the burden and expense of

17  individual prosecution of the complex and extensive litigation necessitated by Intuit's conduct.  It

18  would be virtually impossible for members of the Class individually to redress effectively the

19  wrongs done to them.

20      187.    Even if the members of the Class could afford such individual litigation, the court

21  system could not.  Individualized litigation presents a potential for inconsistent or contradictory

22  judgments.  Individualized litigation increases the delay and expense to all parties, and to the

23  court system.  By contrast, the class action device presents far fewer management difficulties, and

24  provides the benefits of single adjudication, an economy of scale, and comprehensive supervision

25  by a single court.

26      188.    On information and belief, members of the Class can be readily identified and

27  notified based on available information, including Intuit's records and federal and state tax

28  authority records.

189.    Plaintiffs anticipate no unusual difficulties in managing this class action.

190.    Intuit has acted, and failed and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## CAUSES OF ACTION

### FIRST COUNT
### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
#### (Cal. Bus. & Prof. Code §§ 17200 *et seq.*)

191.    Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

192.    The California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.* ("UCL"), prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice."

193.    Intuit has engaged in unfair, unlawful, and fraudulent business practices by its conduct alleged herein, including by, *inter alia*:

      a.    failing to adequately confirm the identity or authorization of the persons opening TurboTax accounts and preparing and/or filing a given tax return, and facilitating third-party tax fraud, thereby increasing its revenues;

      b.    knowingly and recklessly maintaining deficient protocols that enabled, assisted, and encouraged the opening of fraudulent accounts and the filing of fraudulent tax returns through TurboTax;

      c.    knowingly and recklessly adopting and implementing affirmative policies and practices that encouraged and enabled the opening of fraudulent accounts and the filing of fraudulent tax returns through TurboTax;

      d.    failing to notify and timely notify Plaintiffs and Class members that fraudulent tax returns, and tax returns deemed "suspicious" by Intuit, were filed through TurboTax in their names;

      e.    failing to notify and timely notify relevant tax authorities regarding fraudulent and suspicious tax returns filed through TurboTax;

      f.    concealing and failing to disclose material information, including but not

limited to information regarding the tax fraud and the magnitude of tax

fraud it was allowing to occur through TurboTax, the nature of its deficient

protocols and problematic affirmative policies and practices, and the risks

such deficient protocols, policies, and practices subjected consumers to;

and

      g.    aiding and abetting tax fraud in order to boost its own fee revenues.

194. Intuit's conduct alleged herein violates California public policy, including as that

policy is reflected in various provisions of California statutory, regulatory and common law

regarding prohibitions against fraud and deceit, including but not limited to with respect to tax

filings, and assisting same.[45]

195. Intuit's conduct alleged herein is immoral, unethical, oppressive, unscrupulous,

and substantially injurious to consumers. There is no legitimate utility to Intuit's conduct alleged

herein, and even if there were any utility, it would be significantly outweighed by the gravity of

the harm to consumers caused by Intuit's conduct.

196. Plaintiffs and Class members, and members of the public, reasonably relied on

Intuit to take reasonable measures to prevent TurboTax from being used to file fraudulent tax

returns in their names.

197. Intuit should have disclosed the tax fraud and the extent of the tax fraud it allowed

to occur through TurboTax, and the deficient nature of its protocols and fraudster-friendly

---

[45] *See, e.g.*, Cal. Rev. & Tax. Code § 19705 (person who "[w]illfully aids . . . or advises the preparation or presentation . . . of a [tax] return, affidavit, claim, or other document, that is fraudulent or is false as to any material matter" guilty of a felony); Cal. Penal Code § 530.5 ("Every person who willfully obtains personal identifying information . . . of another person, and uses that information for any unlawful purpose, including to obtain, or attempt to obtain, credit, goods, services, real property, or medical information without the consent of that person," guilty of "a public offense"); Cal. Civ. Code § 3517 (one cannot "take advantage of his own wrong."); Cal. Civ. Code § 1709 ("One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."); Cal. Civ. Code § 2224 ("One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it."); Cal. Rev. & Tax. Code § 19701 ("making, rendering, signing, or verifying any false or fraudulent [tax] return or statement" a felony); Cal. Penal Code § 550 (to "[k]nowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim," unlawful).

policies and practices, and the corresponding risks they created, to affected consumers, to potentially affected consumers, and to the public, because such information is material and Intuit was in a superior position to know the true facts. Plaintiffs and Class members could not reasonably be expected to learn or discover the true facts; they reasonably relied on Intuit to inform them of such material facts.

198. The sharp increase in fraudulent tax filings during the relevant time period, including but not limited to in 2015, constitutes a security issue that triggered and reinforced Intuit's duties to disclose described herein.

199. Intuit breached its duties to disclose as alleged herein, as to Plaintiffs and the Class.

200. Intuit's acts and practices alleged herein have deceived Plaintiffs, and are likely to deceive the public.

201. By failing to notify Plaintiffs and Class members regarding the above, including as to the fraudulent tax filings made in their names, Intuit breached its duty to disclose these facts, violated the UCL, and injured Plaintiffs and the Class.

202. The information that Intuit failed to disclose, as alleged herein, was material information to Plaintiffs and the Class members, as it would have been to all reasonable consumers.

203. Intuit's conduct alleged herein is also unlawful, including because it constitutes violations of common law and other additional federal and state statutes and regulations.

204. As a result of Intuit's violations of the UCL, Plaintiffs and the Class members have lost, and will continue to lose, money or property.

205. The injuries suffered by Plaintiffs and the Class members as a result of Intuit's violations of the UCL are greatly outweighed by any potential countervailing benefit to consumers or to competition, if any. Plaintiffs and Class members could not reasonably have avoided such injuries. Furthermore, to the extent that Intuit has discretion in choosing and implementing authentication and security measures and policies and practices, and providing notice of fraudulent conduct, it has exercised any such discretion unreasonably and in bad faith.

206. The application of the UCL to Plaintiffs and Class members outside the state of California is appropriate. Intuit is headquartered in California, and on information and belief all or substantially all of the acts and decisions by Intuit that form the basis of this claim occurred and were made within California. Moreover, while no TOS or EULA regarding any Plaintiffs or Class members govern the claims alleged herein (as discussed above), during the relevant time period Intuit's form TOS and EULA have provided for the nationwide application of California law (i.e., for the application of California law regardless of where the consumer resides), further supporting that applying California law on a nationwide basis here would be reasonable and that Intuit itself (which drafted the choice-of-law provision and has further urged the application of its EULA and TOS in this case) concedes that application of California law nationwide would be reasonable and appropriate and not prejudicial to Intuit.

207. Unless restrained by this Court, Intuit will continue to engage in the unfair, fraudulent, and unlawful conduct alleged herein, in violation of the UCL.

208. Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Intuit, to obtain restitutionary disgorgement of all monies and revenues generated by Intuit as a result of such practices, and to obtain all other relief allowed under the UCL.

## SECOND COUNT
## NEGLIGENCE

209. Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

210. Given, *inter alia*, Intuit's knowledge that it allowed large numbers of fraudulent accounts to be opened and fraudulent returns to be filed through TurboTax each year; its knowledge that its own lax protocols and affirmative policies and practices were enabling and assisting the fraud; its knowledge that there were available measures that it could have taken to address the fraud (including measures that its own security personnel were recommending and that its competitors had adopted); its knowledge of the continuing and increasing risk of SIRF and ATO fraud; given that Intuit was in the business of filing of income tax returns and thus was in a unique position of power, responsibility, information, and trust; given Intuit's position as a

dominant player in the tax preparation and e-filing industry; and given its knowledge that consumers did not have the pertinent information that Intuit had and could not sufficiently monitor or protect themselves against the risk of fraudulent filings through TurboTax, Intuit owed a duty of care to the Plaintiffs and the Class members. Any of the above factors, alone, would have created a duty of reasonable care. Together, the duty of care owed by Intuit is particularly evident and strong.

211. The fraud perpetrated by the fraudsters and the harm caused to Plaintiffs and the Class were absolutely foreseeable to Intuit. In fact, the fraud and the harm were fore*seen* by Intuit, which had been aware for years that this fraud had been occurring on a massive scale through TurboTax every year, and that its own protocols, policies, and procedures were encouraging and enabling the fraud. Moreover, the specific instances of fraud perpetrated on Plaintiffs and the Class were foreseeable to Intuit in light of the information and capabilities available to Intuit and in its possession.

212. Intuit was uniquely situated in terms of its knowledge of the pertinent material facts and its ability to employ protocols to detect, identify, and prevent fraud as to Plaintiffs and the Class.

213. To the extent Intuit may have been limited in any way in its ability to withhold the filing of tax returns that it allowed to be prepared using TurboTax software, including those it deemed suspicious, then in particular given its knowledge of the ongoing and increasing occurrence and risk of tax fraud, Intuit had a duty to maintain reasonable authentication and security protocols regarding the opening of new TurboTax accounts, including but not limited to where TurboTax accounts were sought to be opened for identities and Social Security numbers for which TurboTax accounts already existed, and to maintain policies and practices that did not encourage fraudsters to carry out this fraud through TurboTax.

214. Intuit owed a duty, in particular, to Plaintiffs and the Class members, as persons in whose names Intuit allowed tax returns to be filed through TurboTax.

215. Intuit provided, and was in the business of providing, expert assistance and software to the public for the preparation of tax returns, and processed such returns in the course

of submitting them to the designated government agency. Intuit had a duty to provide services consistent with the care, skill, knowledge, and competence of members of that profession.

216. Intuit had a duty to use reasonable means to detect and prevent the criminal misuse of TurboTax for the preparation and filing of tax returns.

217. Intuit breached its duties to Plaintiffs and the Class through its conduct alleged herein.

218. Intuit would have been able to detect, identify, and prevent fraud as to Plaintiffs and the Class had it not maintained deficient protocols and not maintained fraudster-friendly policies and practices as alleged herein.

219. As a result of Intuit's breaches of its duties, Plaintiffs and the Class members have been injured as alleged herein.

220. The harm that Plaintiffs and the Class members have suffered and will suffer, as alleged herein, were foreseeable results of Intuit's conduct alleged herein. Intuit knew and/or should have known that its conduct would cause such harm.

221. Plaintiffs, on behalf of themselves and the Class, seek relief as prayed for below.

## THIRD COUNT
## AIDING AND ABETTING FRAUD

222. Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

223. Plaintiffs bring this claim under the common law rule for imposing liability based on aiding and abetting, which has been adopted by California courts.

224. Fraudsters utilized TurboTax to open fraudulent accounts and to file fraudulent tax returns in the names of Plaintiffs and the Class members.

225. Intuit's conduct alleged herein enabled, substantially assisted, encouraged, and was a substantial factor in, the fraud committed as to Plaintiffs and the Class members.

226. Intuit knew for years that this fraud was occurring on a massive scale every year through TurboTax, and further had information and knowledge sufficient to identify the instances of fraud that occurred and the capability (and/or would have had the capability but for its

deliberate choice not to utilize available means) to detect, notify the victims of, and prevent, the specific instances of this fraud from occurring through TurboTax.

227.    Intuit intentionally aided and assisted in the fraud in order to bolster its own fee revenue.  Intuit substantially contributed to the perpetration of fraud on Plaintiffs and the Class.

228.    Intuit's assistance went well beyond the passive failure to adopt better security measures.  Indeed, Intuit's affirmative policies and practices which enabled and encouraged the fraud—including but by no means limited to its policies of allowing TurboTax fees to be paid from refund proceeds, and for refunds to be paid by non-traceable means—were critical to fraudsters being able to perpetrate the fraud.  But for Intuit's deficient protocols and its policies and practices that encouraged and enabled the fraud, the fraudsters certainly would not have been able to carry out this fraud on anything close to the same scale they have now done for years.

229.    Intuit had actual knowledge that there were measures that it could have taken to prevent TurboTax from being used to perpetrate tax fraud, but nevertheless knowingly and deliberately decided not to adopt such measures and to instead maintain the deficient protocols, policies, and practices, that enabled and assisted the fraud.

230.    Intuit substantially assisted the fraud as to Plaintiffs and the Class by deliberately maintaining protocols, policies, and practices that made it easy and encouraged fraudsters to open false accounts and file the fraudulent tax returns in Plaintiffs' and the Class members' names.

231.    Intuit substantially assisted the fraud as to Plaintiffs and the Class by providing a fee payment mechanism that allowed and enabled fraudsters to attempt to file fraudulent returns through TurboTax without any financial outlay.

232.    Intuit substantially assisted the fraud as to Plaintiffs and the Class by providing refund payment options that allowed and enabled fraudsters to carry out their conduct undetected.

233.    Intuit substantially assisted the fraud as to Plaintiffs and the Class by failing to provide notice and timely notice to Plaintiffs and the Class, and by failing to provide notice and timely notice to the relevant tax agencies.

234.    Intuit conduct alleged herein was knowing and intentional, and was carried out by Intuit in order to benefit Intuit, including in the form of ill-gotten fee revenues.

235. Intuit had specific, contemporaneous knowledge of the fraud alleged herein and intended, by its conduct alleged herein, to participate in and assist the fraud. Intuit made the conscious decision to participate in and assist the fraud alleged herein, in order to benefit itself.

236. Intuit intended for fraudsters to use TurboTax, rather than use Intuit's competitors, to file fraudulent tax returns, including for Plaintiffs and the Class members.

237. Before and during the commission of the fraud, Intuit intended to aid and abet, and did substantially assist, fraudsters in the opening of fraudulent accounts and the filing of fraudulent tax returns by knowingly maintaining deficient authentication and security protocols, maintaining affirmative policies and practices which it knew encouraged and enabled the fraud, and by failing to ensure that the person creating an account and filing a tax return through TurboTax was authorized to use the identity in question for that purpose.

238. Before and during the commission of the fraud, Intuit intended to aid and abet, and did substantially assist, fraudsters in the filing of fraudulent tax returns by failing to employ commercially reasonable means of authenticating that persons opening TurboTax accounts and filing tax returns through TurboTax were authorized to use the identity in question.

239. Before and during the commission of the fraud, Intuit intended to aid and abet, and did substantially assist, fraudsters in the filing of fraudulent tax returns by transmitting such fraudulent tax returns in Plaintiffs' and Class members' names to the IRS and state tax agencies.

240. Before and during the commission of the fraud, Intuit intended to aid and abet, and did substantially assist, fraudsters in the filing of fraudulent tax returns by failing to timely transmit to the IRS or state tax agencies data in Intuit's possession regarding filings that were deemed suspicious by Intuit or that were suspicious pursuant to other reasonable standards.

241. Intuit's conduct alleged herein did in fact aid and abet, and was a substantial factor in, the commission of fraud upon Plaintiffs, members of the Class, the United States government, and state governments.

242. As a result of Intuit's conduct, Plaintiffs and Class members have been injured as alleged herein.

243. As a result of Intuit's conduct alleged herein, Intuit has unfairly received and

retained substantial amounts of money, including substantial ill-gotten fees. All amounts that Intuit has wrongfully received and retained through its misconduct alleged herein, should be disgorged by Court Order.

244. Plaintiffs, on behalf of themselves and the Class, seek relief as prayed for below.

## FOURTH COUNT
## UNJUST ENRICHMENT

245. Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

246. Significant unjust benefits were conferred upon Intuit as a direct result of its misconduct alleged herein. Such benefits include, but are not necessarily limited to, tax preparation fees and refund processing fees that Intuit received and retained related to fraudulent tax returns filed through TurboTax in the names of Plaintiffs and the Class members.

247. It would be inequitable for, and good conscience militates against permitting, Intuit to retain the amounts that it received as a result of its misconduct alleged herein.

248. Plaintiffs and the Class members are entitled to restitution of, disgorgement of, and/or the imposition of a constructive trust upon, all amounts obtained by Intuit as a result of its misconduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Class, respectfully request that this Court:

A. determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class;

B. appoint Plaintiffs as the representatives of the Class and their counsel as Class counsel;

C. enter judgment against Intuit for Plaintiffs' and Class members' asserted causes of action;

D. award all actual, general, special, incidental, statutory, equitable, punitive, and consequential damages, and restitution, to which Plaintiffs and the Class members are entitled;

1         E.     order Intuit to disgorge all amounts that it has received through its misconduct

2    alleged herein;

3         F.     award pre-judgment and post-judgment interest;

4         G.     grant appropriate injunctive and/or declaratory relief, including, without limitation,

5    an order requiring Intuit to discontinue its problematic policies and practices alleged herein, and

6    to implement appropriate authentication, security, and notification protocols;

7         H.     award reasonable attorneys' fees and costs, including but not limited to pursuant

8    California Code of Civil Procedure § 1021.5 and any other relevant statutes and laws; and

9         I.     grant such further relief as the Court deems appropriate.

10   Dated: November 17, 2017     Respectfully submitted,

11        LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

12

13        By:     _/s/ Roger N. Heller_____

14        Michael W. Sobol (msobol@lchb.com)
     Roger N. Heller (rheller@lchb.com)

15        275 Battery Street, 29th Floor
     San Francisco, CA 94111

16        415.956.1000

17

18   Dated: November 17, 2017     ABBOTT LAW GROUP P.A.

19

20        By:     _/s/ Steven W. Teppler_____

21        Steven W. Teppler (FL SBN 14787)
     steppler@abbottlawpa.com

22        2929 Plummer Cove Road
     Jacksonville, FL 32223
     904.292.1111

23

24

25

26

27

28

Dated: November 17, 2017  GOLDMAN SCARLATO & PENNY, P.C

By: _/s/ Mark S. Goldman_

Mark S. Goldman (goldman@lawgsp.com)
Eight Tower Bridge
161 Washington Street, Suite 1025
Conshohocken, PA 19428
484.342.0700

Dated: November 17, 2017  MILBERG LLP

By: _/s/ Ariana J. Tadler_
Ariana J. Tadler (atadler@milberg.com)
One Pennsylvania Plaza, 49th Floor
New York, NY 10119
212.946.9453

Dated: November 17, 2017  SIPRUT, PC

By: _/s/ Joseph J Siprut_

Joseph J Siprut (jsiprut@siprut.com)
17 North State Street, Suite 1600
Chicago, IL 60602
312.236.0000

*Attorneys for Plaintiffs and the Proposed Class*

1460683.6