IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE INTUIT DATA LITIGATION | Master Docket No. 15-CV-1778-EJD |
| THIS DOCUMENT RELATES TO:<br><br>**ALL ACTIONS** | **DECLARATION OF JENNIFER M. KEOUGH REGARDING PROPOSED CLASS MEMBER NOTIFICATION PROGRAM**<br><br>Judge: Edward J. Davila |

Jennifer M. Keough, declares and states as follows:

1. I am the Chief Executive Officer of JND Legal Administration ("JND"), the Settlement Administrator retained in this matter. I make this declaration in support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement. The following statements are based on my personal knowledge and information provided to me by counsel for the Parties in this Action and other JND employees working under my supervision and, if called upon to do so, I could and would testify competently thereto.

2. JND is a legal administration services provider with operation centers in Denver, Minneapolis, and Seattle. JND has extensive experience with all aspects of legal administration and has administered settlements in hundreds of class action cases. JND was chosen as the Settlement Administrator in this Action after going through a competitive bidding process.

3. As CEO of JND, I am involved in all facets of our company's operations. Among my responsibilities is monitoring the implementation of our notice and claim administration

1    programs.  I submit this declaration at the request of counsel to describe the proposed program
2    for providing notice to Class Members.

3          4.      I have more than 20 years of experience creating and supervising class action
4    settlement notice and claims administration programs.  I have personally overseen well over 500
5    matters.  A comprehensive description of my experience is attached hereto as Exhibit A.

6          5.      In the instant matter, JND has been engaged to help develop and implement a
7    proposed legal notice program (the "Notice Program") to provide notice of a settlement (the
8    "Settlement").  As more fully described below, the proposed plan will provide notice to Class
9    Members who include: "All persons in the United States in whose identities fraudulent federal
10   tax returns for the Tax Years 2014, 2015, and/or 2016 were filed using TurboTax, as
11   determined by the United States Internal Revenue Service.  Excluded from the Class are all
12   employees of Intuit, counsel for the Parties, the Judge presiding over this Action, and Court
13   staff."

14         6.      JND's comprehensive Notice Plan consists of a variety of components designed
15   to reach Class Members so they can be informed of their rights and participate in the Settlement.
16   The Notice Plan includes notice sent directly to Class Members via email and mail, as well as
17   notice via the Settlement Website.

18         7.      The notice will inform Class Members of the Settlement, the subject matter of
19   the Action, and Class Member rights to object to the Settlement.  The administration plan will
20   allow Class Members to readily access information and enroll online, through the Settlement
21   Website set up specifically for this case, in the credit monitoring benefit provided by the
22   Settlement.

23                                     **Notice Plan**

24         8.      **Class List**:  JND understands that it will receive a "Class List" of the Class
25   Members from Intuit, which will include the information necessary for disseminating email and
26   mail notice as applicable.

27         9.      **Email Notice:**  For Class Members who are current or former Intuit customers
28   (based on Intuit's records), JND will implement an Email Notice program.  Upon receipt of the

email addresses for these Class Members, on the Class List, JND will load the information into a database created for this Settlement. JND will send Email Summary Notice to these Class Members. Based on conversations with the Parties, JND understands that approximately half of the Class Members on the Class List are current or former Intuit customers, and thus will be part of the Email Notice program.

10. **Mailed Notice**: For Class Members who are not current or former Intuit customers (based on Intuit's records), JND will implement a Mailed Notice program. Specifically, JND—through TransUnion Risk and Alternative Data Solutions, Inc.—will conduct advanced address research (skip-trace) using names and Social Security Numbers provided in the Class List data to locate valid mailing addresses. Where JND is able to locate a valid mailing address through this skip-trace research, JND will send by first-class U.S. Mail the Postcard Summary Notice. JND will update all addresses using the United States Postal Service's National Change of Address database.[1]

11. **Website Notice**: JND will also create an informational, interactive website dedicated to the case to enable Class Members to get information about the Action and the Settlement. The website will contain a URL that logically relates to the Settlement (www.IntuitDataLitigation.com). The website will be optimized for mobile devices, will have an easy-to-navigate design, and will be formatted to emphasize important information and deadlines. Other available features include online sign-up for the credit monitoring benefit, a frequently asked questions page, and links to downloadable copies of the Settlement Agreement, Detailed Notice, the Credit Monitoring Enrollment Form, and other important Court documents.

12. **Toll-Free Number:** JND will make available its scalable call center resources in order to manage the incoming telephone calls received in response to the Notice Plan. JND will

---

[1] The NCOA database is the official United States Postal Service ("USPS") technology product which makes change of address information available to mailers to help reduce undeliverable mail pieces before mail enters the mail stream. This product is an effective tool to update address changes when a person has completed a change of address form with the USPS. The address information is maintained on the database for 48 months.

establish and maintain a 24-hour, toll-free telephone line where callers may obtain information about the Action.

### Approximate Cost of Notice Program and Administration

13.  JND has prepared a proposal of estimated costs (the "Proposal") and has submitted it to the Parties in this Action. Under the Proposal, JND estimates a total cost of $251,936 to administer the Settlement (assuming a 10% opt-in rate). The Proposal assumes a total Class size of 915,715 Class Members and anticipates sending Notice by email to 50% of the Class and by U.S. mail to the remainder of the Class for whom mailing addresses are able to be derived through skip-trace address research. The Proposal is attached as Exhibit B.

### Notice Design and Content

14.  I have reviewed the proposed notice documents and believe they are in plain language. The proposed notice documents comply with the Federal Judicial Center's guidelines for class action notices as well as the procedural guidelines for the Northern District of California.

15.  Each notice is designed to attract the attention of the recipient so they will be encouraged to read the contents and take action if needed. The outside of the Postcard Summary Notice and the email subject line contain language to indicate that important Court-ordered information is enclosed. Each Notice contains plain and easy-to-read summaries of the Settlement and the options that are available to each potential Class Member. Additionally, each Notice provides instructions on how to obtain more information about the Settlement.

**Conclusion**

16.     I believe the Notice Plan, as well as the Detailed Notice and Summary Notice attached as exhibits, will provide the best notice practicable under the circumstances, are consistent with the requirements set forth in Rule 23 of the Federal Rules of Civil Procedure and all applicable court rules, and are consistent with other similar court-approved best notice practicable notice programs.  The Notice Plan is designed to reach as many Settlement Class Members as possible and provide them with the opportunity to review a plain language notice with the ability to easily take the next step and learn more about this Action.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed on August 23, 2018, at Seattle, Washington.

*[signature]*

JENNIFER M. KEOUGH

# EXHIBIT A

# JENNIFER KEOUGH
## CHIEF EXECUTIVE OFFICER AND CO-FOUNDER





## I. INTRODUCTION

Jennifer Keough is Chief Executive Officer and a Founder of JND Legal Administration ("JND"). JND specializes in the administration of class action, mass tort, bankruptcy, government services and eDiscovery matters. With offices in Seattle, Denver, Minneapolis and New York, JND is the fastest growing company in the legal administration space.

Ms. Keough is recognized by practitioners on both sides of the aisle as an expert in all facets of class action administration, from notice through distribution. She is often called upon to consult with parties prior to settlement because of her experience in all phases of administration, not just notice. Ms. Keough has more than 20 years of legal experience. During her career in legal administration she has handled some of our country's largest, most high-profile engagements, including the BP Deepwater Horizon Settlement, Cobell Indian Trust Settlement, Engle Smokers Trust Fund, Gulf Coast Claims Facility, Stryker Modular Hip Settlement, and Verizon Wireless FTC Litigation. In 2015, she was named a "Woman Worth Watching" by Profiles in Diversity Journal. She is frequently invited to speak on class action issues and has written numerous articles in her areas of expertise. In 2013, she was profiled in a CNN article, "What Changes With Women in the Boardroom."

As the CEO of JND Legal Administration, Ms. Keough has a hand in all facets of the business, from day-to-day processes to high-level strategy. She oversees all aspects of JND's class action division including noticing, claims processing, Systems and IT work, call center, data analytics, recovery calculations, check distribution and reporting. But Ms. Keough also provides her expertise and knowledge to all other divisions of JND as well, including mass tort, corporate restructuring, government services, data analytics, and eDiscovery.

Prior to forming JND, Ms. Keough was Chief Operating Officer and Executive Vice President of Garden City Group, another large nationwide administration firm. In her former role, Ms. Keough oversaw operations in several offices across the country and was responsible for growing its Seattle office into a 250-person shop. Prior to that position, Ms. Keough worked as a class action business analyst at Perkins Coie, one of the country's premier defense firms, responsible for managing complex class action settlements and remediation programs, including the selection, retention, and supervision of legal administration firms.

While at Perkins, Ms. Keough was responsible for all administration efforts related to the Weyerhaeuser siding case, one of the largest building product class action settlements ever. She not only oversaw the outside administration firm selected by the parties, but she worked closely with plaintiffs' counsel, Lieff Cabraser, and developed a reputation of fairness in being able to see both sides of a settlement program.

Ms. Keough has played a role in a number of landmark cases including the BP Deepwater Horizon class action, which arose out of the largest oil spill in our nation's history and the Cobell American Indian $3.2 billion settlement, the largest government class action settlement in history. In connection with that settlement, Ms. Keough was called upon to testify before the Senate Committee for Indian Affairs, where Senator Jon Tester of Montana praised her work in connection with Notice efforts to the American Indian community stating "Oh, wow. Okay… the administrator has done a good job, as your testimony has indicated, [discovering] 80 percent of the whereabouts of the unknown class members."

As discussed below, Ms. Keough has created and supervised multiple notice plans. While creating notice plans, she considers not only the most effective notice plans, but also the implications the notice plan will have on all facets of the class action administration. With her experience, she is able to create a comprehensive notice and administration program that is unique to each client's needs.

Ms. Keough earned her J.D. from Seattle University. She graduated from Seattle University with a B.A. and M.S.F. with honors.


## II. LARGE CASE EXPERIENCE

Jennifer Keough has the distinction of personally overseeing more large class action settlement programs than any other notice expert. In her 20-year career she has managed and directly overseen hundreds of projects from notice through distribution of settlement awards. Some of the largest engagements are as follows:

1. ### *In re The Engle Trust Fund*
   **No. 94-08273 CA 22 (11th Jud. Cir. Ct., Miami-Dade County Ct.)**
   Ms. Keough played a key role in administering this 800 million dollar landmark case against the country's five largest tobacco companies. Miles A. McGrane, III, Trustee to the Engle Trust Fund recognized Ms. Keough's role when he stated:

   > The outstanding organizational and administrative skills of Jennifer Keough cannot be overstated. Jennifer was most valuable to me in handling numerous substantive issues in connection with the landmark Engle Trust Fund matter. And, in her communications with affected class members, Jennifer proved to be a caring expert at what she does.

2. ### *Cobell v. Salazar*
   **No. 1:96 CV 01285 (TFH) (D. D.C.)**
   As part of the largest government class action settlement in our nation's history, Ms. Keough worked with the US Government to implement the administration program responsible for identifying and providing notice to the two distinct but overlapping settlement classes. As part of the notice outreach program, Ms. Keough participated in multiple town hall meetings held at Indian reservations located across the country. Due to the efforts of the outreach program, over 80% of all Class Members were provided notice. Additionally, Ms. Keough played a role in creating the processes for evaluating claims and ensuring the correct distributions were made. Under Ms. Keough's supervision, the processing team processed over 480,000 claims forms to determine eligibility. Less than one half of 1 percent of all claim determinations made by the processing team were appealed. Ms. Keough was called upon to testify before the Senate Committee for Indian Affairs, where Senator Jon Tester of Montana praised her work in connection with Notice efforts to the American Indian community when he stated: "Oh, wow. Okay… the administrator has done a good job, as your testimony has indicated, [discovering] 80 percent of the whereabouts of the unknown class members." Additionally, the evaluating the Notice Program, the Court concluded:

   > …that adequate notice of the Settlement has been provided to members of the Historical Accounting Class and to members of the Trust Administration Class…. Notice met and in many cases exceeded the requirements of F.R.C.P.

23(c)(2) for classes certified under F.R.C.P. 23(b)(1), (b)(2) and (b)(3). The best notice practicable has been provided class members, including individual notice where members could be identified through reasonable effort. The contents of that notice are stated in plain, easily understood language and satisfy all requirements of F.R.C.P. 23(c)(2)(B).

3. **Gulf Coast Claims Facility (GCCF)**

The GCCF was one of the largest claims processing facilities in U.S. history and was responsible for resolving the claims of both individuals and businesses relating to the Deepwater Horizon oil spill. The GCCF, which Ms. Keough helped develop, processed over one million claims and distributed more than six billion dollars within its year-and-a-half tenure. As part of the GCCF, Ms. Keough coordinated a large notice outreach program which included publication in multiple journals and magazines in the Gulf Coast area. She also established a call center staffed by individuals fluent in Spanish, Vietnamese, Laotian, Khmer, French and Croatian.

4. **In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010**
No. 2179 (MDL) (E.D. La.)

Following the closure of the Gulf Coast Claims Facility, the Deepwater Horizon Settlement claims program was created. There were two separate legal settlements that provided for two claims administrations programs. One of the programs was for the submission of medical claims and the other was for the submission of economic and property damage claims. Ms. Keough played a key role in the formation of the claims program for the evaluation of economic and property damage claims. Additionally, Ms. Keough supervised the call center located in Hammond, Louisiana.

5. **New Orleans Tax Assessor Project**

After Hurricane Katrina, the City of New Orleans began to reappraise properties in the area which caused property values to rise. Thousands of property owners appealed their new property values and the City Council did not have the capacity to handle all of the appeals in a timely manner. As a result of the large number of appeals, the City of New Orleans hired Ms. Keough to design a unique database to store each appellant's historical property documentation. Additionally, Ms. Keough designed a facility responsible for scheduling and coordinating meetings between the 5000 property owners who appealed their property values and real estate agents or appraisers. The database that Ms. Keough designed facilitated the meetings between the property owners and the property appraisers by allowing the property appraisers to review the property owner's documentation before and during the appointment with them.

6. **In Re General Motors LLC Ignition Switch Litigation**

    Ms. Keough oversaw the creation of a Claims Facility for the submission of injury claims allegedly resulting from the faulty ignition switch. The Claims Facility worked with experts when evaluating the claim forms submitted. First, the Claims Facility reviewed thousands of pages of police reports, medical documentation, and pictures to determine whether a claim met the threshold standards of an eligible claim for further review by the expert. Second, the Claims Facility would inform the expert that a claim was ready for its review. Ms. Keough constructed a database which allowed for a seamless transfer of claim forms and supporting documentation to the expert for further review.

7. **C.F.P.B. v. Cellco P'ship**
    No. 15-3268 (D. N.J.)

    Ms. Keough oversaw the design and implementation of a Refund Program. As part of the design of the Program, Class Members were able to download their Billing Summary from a secure website to aid in completing their claim form.

8. **In re Washington Mutual Inc., Securities**
    No. 2:08-md-1919 MJP (W.D. Wash.)

    Ms. Keough supervised the Notice and Claims Administration for this securities class action which included three separate settlements with defendants totaling $208.5 million. In addition to mailing notice to over one million Class Members, Ms. Keough was in charge of the Claims Administration Program. The claims administration program included the review and processing of claims, notification of claim deficiencies, and distribution. In preparation for the processing of claims, she established a unique database to store the Proofs of Claim and supporting documentation, trained staff to the particulars of this settlement, created multiple computer programs for the entry of Class Member's unique information, and oversaw the development of a program to calculate the Recognized Loss Amounts pursuant to the Plan of Allocation. The program was designed to allow Proofs of Claim to be filed by mail or through an online portal. The deficiency process was established in order to reach out to Class Members who submitted incomplete Proof of Claims. It involved reaching out to claimants via letters, emails, and telephone calls.

9. **In re Polyurethane Foam Antitrust Litigation**
    No. 10-MD-2196 (N.D. Oh.)

    Ms. Keough helped design and implement a Notice and Claims Administration Program intended to reach both known and unknown Class Members of six separate Settlements and process the claim forms submitted. The Notice Program included publication notice in nine trade publications, internet banner advertising on five websites, a press release in English and Spanish, an

informational website, the mailing of notice to known class members, and a toll-free telephone number. The Claims Administration Program Ms. Keough helped develop and implement received over 7,400 claim forms, or a timely claim rate of 66.66%.

### 10. In re Air Cargo Shipping Services Antitrust Litigation

This Antitrust Settlement involved five separate settlements. As many Class Members were affected by more than one of the Settlements, Ms. Keough constructed the notice and claims programs for each settlement in a manner which allowed for the comparison of claims data. Each claims administration program included claims processing, review of supporting evidence, and a deficiency notification process. The deficiency notification process included mailing of deficiency letters, making follow up phone calls, and sending emails to class members in order to help them complete their claim. To ensure accuracy throughout the claims process for each of the Settlements, Ms. Keough created an audit process which audited many of the claims that were eligible for payment.

### 11. Careathers vs. Red Bull North America, Inc.
No. 13-cv-00369 (KPF) (S.D.N.Y.)

Due to the nature of this case, direct notice was impossible. Therefore, Ms. Keough assisted in the design of a publication notice and claims administration program intended to reach the greatest amount of affected individuals as possible. In consultation with Class Counsel, Ms. Keough determined the best publications for the Notice to be published in. Due to the successful notice program, the informational website created as part of the Notice Program received an unprecedented 67 million hits in less than 24 hours. The Claims Administration program received over 2 million claim forms submitted through the three available filing options: online, mail, and email. The Court approved the notice program finding:

> ...that the Notice to the Settlement Class... was collectively the best notice practicable under the circumstances of these proceedings of the matters set forth therein, and fully satisfies the requirements of Rule 23(c)(2)(B) of the Federal Rules of Civil Procedure, due process, and any other applicable laws.

### 12. In re Classmates.com
No. C09-45RAJ (W.D. Wash.)

Ms. Keough managed a team that provided email notice to over 50 million users with an estimated success rate of 89%. When an email was returned as undeliverable, it was resent up to three times in an attempt to provide notice to the entire class. Additionally, Ms. Keough implemented a claims administration program which received over 699,000 claim forms and maintained three email

addresses in which to receive objections, exclusions, and claim form requests. The Court approved the program when it stated:

> The Court finds that the form of electronic notice… together with the published notice in the *Wall Street Journal*, was the best practicable notice under the circumstances and was as likely as any other form of notice to apprise potential Settlement Class members of the Settlement Agreement and their rights to opt out and to object. The Court further finds that such notice was reasonable, that it constitutes adequate and sufficient notice to all persons entitled to receive notice, and that it meets the requirements of Due Process….

# EXHIBIT B



*Confidential*
Jennifer Keough - CEO
(206) 919-5768
jennifer.keough@jndla.com

**Roger Heller| Lieff Cabraser Heimann & Bernstein LLP| rheller@lchb.com**
**Mark Goldman| Goldman, Scarlato & Penny P.C.| goldman@lawgsp.com**
*In re: Intuit Data Litigation Settlement Administration*

### Assumptions and Notes:

1. Assumes 915,715 class members
2. Assumes email notice sent to 50% of the class (457,858)
3. Perform skip trace on class members for whom an email address was not available (457,858)
4. Assumes names and SSNs are provided for skip tracing and mailing address is found for 80% of searches performed
5. Print and mail postcard notice to 366,286; receive and process undeliverable notices (assumes 5%)
6. Establish dedicated website for credit monitoring sign up
7. Assumes 10% opt-in rate (assumes 95% online and 5% paper)
8. Establish dedicated toll-free number with IVR only (assumes 1% of class calls for 2 mins/call)
9. Coordinate distribution of credit monitoring codes

|  |  |  |  | **Cost Estimate** |
|---|---|---|---|---|
| **Project Management** | | | | |
| Interaction with counsel, status reports, supervision of project team, resolution of issues, court report | | | | |
| Estimated Months: | 12 | | | |
| | | | | $ 13,300 |
| **Case-Specific Website with Online Filing** | | | | |
| Develop and host dedicated website with downloadable forms, and online claim submission | | | | |
| | | | | $ 8,750 |
| **Call Center** | | | | |
| Set up toll-free number and IVR menu, monthly and per-minute charges | | | | |
| Estimated Calls: | 9,160 | | | |
| | | | | $ 6,300 |
| **Database Management** | | | | |
| Reverse lookup for class member addresses for whom an email address was not available | | | | |
| Estimated records researched | 457,858 | | | |
| Reverse lookup cost | $ 0.08 | | $ 36,629 | |
| Class list clean-up, research and update addresses via NCOA and skip-trace databases | | | $ 7,700 | |
| Electronic Data Storage | | | $ 6,750 | |
| Create project specific database; develop processing procedures | | | $ 1,050 | |
| | | | | $ 52,129 |
| **Email Notice** | | | | |
| Create list for email, finalize content, implement email notice | | | | |
| Estimated Emails: | 457,858 | | | |
| | | | | $ 3,800 |
| **Mail Notice** | | | | |
| Format/quality review notice | | | $ 700 | |
| Print and mail notice to class members for whom an email address was not available | | | | |
| Estimated items mailed | 366,286 | | | |
| Printing/Materials/Mailing Services | $ 0.04 | $ 14,651 | | |
| Estimated Postage | $ 0.26 | $ 95,234 | | |
| | | | $ 109,886 | |
| Track undeliverables; remail forwards | | | $ 3,022 | |
| | | | | $ 113,607 |
| **Process Forms** | | | | |
| Process mailed forms | Estimated forms received | 4,579 | | |
| | Cost per form | $ 0.65 | | |
| | | | $ 2,976 | |
| Process online forms | Estimated forms received | 87,001 | | |
| | Cost per form | $ 0.20 | | |
| | | | $ 17,400 | |
| Validate forms; final review; identify and resolve issues | | | $ 2,100 | |
| | | | | $ 22,477 |
| **Distribute Credit Monitoring Codes** | | | | |
| Finalize content, implement email notice | | | $ 600 | |
| Email Credit Monitoring Codes | | | | |
| Estimated Emails Sent | 91,580 | | | |
| Cost per email | $ 0.01 | | | |
| | | | $ 916 | |
| | | | | $ 1,516 |
| | | | **Total** | **$ 221,878** |

Cost Estimate -In re Intuit Data Litigation bounces separated.xlsm
Model: V1.0

Created: 8/23/2018



All services to be provided by JND Legal Administration ("JND") are subject to the following terms and conditions:

1. **SERVICES**: JND agrees to perform all services necessary to complete the tasks outlined in the applicable proposal or other documents or per its understanding about the Client assignment. Such Services do not in any way constitute legal services or advice.

2. **PAYMENT**: The Client agrees to pay JND for the Services as outlined in the Proposal or other agreement between the parties. Client agrees and understands that fees charged by JND may include mark-ups, commissions, or other arrangements constituting potential profits to JND. Client further agrees that the prices to be charged by JND were negotiated at arm's length and that total fees are estimates and that the actual amount charged may be greater or lesser than the estimated amounts. JND reserves the right to increase its hourly rates annually.

3. **EXPENSES**: JND shall also bill for all expenses reasonably incurred in connection with the Services. These expenses include but are not limited to postage, FedEx, P.O. Box rental, travel, brokerage fees, accounting fees, electronic storage ($0.006 per image/record), and other items associated with the Services. JND may receive rebates or credits from vendors in connection with volume of work performed for all of its Clients. JND may also receive financial benefits from banks or other institutions based on settlement funds on deposit. These credits/rebates/awards are solely the property of JND.

4. **BILLING**: JND shall invoice clients every 30 days and expect payment within thirty (30) days of receipt of invoices. Payment for postage and printing is due in advance of mailing.

5. **INDEPENDENT CONTRACTOR**: JND is performing its Services as an Independent Contractor and neither it nor its employees shall be deemed to be employees of the Client.

6. **CONFIDENTIALITY**: JND and the Client will each treat as confidential any documents shared by one party with the other. JND does not convey to the Client any right in the programs, systems, or methodologies used or provided by JND in the performance of this assignment.

7. **DATA PRIVACY**: JND Is committed to taking all reasonable steps to ensure the security of all client and claimant data entrusted to our care. We seek to protect confidential data in all of our engagements, including this one, regardless of the size of the matter or the amount of data at issue. Please see JND's complete Privacy Policy at www.jndla.com/privacy-policy regarding data collection and use.

8. **LIMITATION OF DAMAGES**: JND is not responsible to the Client for any special, consequential or incidental damages incurred by Client and any liability of JND to the Client shall not exceed the total amount billed to the Client for the particular Services that give rise to any loss.

9. **FORCE MAJEURE**: If any event out of the reasonable control of JND prevents JND's performance, such performance shall be excused.

10. **NOTICE**: Any notice required in connection with the Services shall be in writing and sent by registered mail or overnight courier. Such notice is deemed given if mailed five days after the date of deposit in the U.S. mail, or if sent by overnight courier, one business day after delivery to such courier.

11. **GOVERNING LAW**: This contract will be governed by and construed by the laws of the State of Washington.

12. **ASSIGNMENT**: This Agreement and the rights and obligations of JND and the Client shall inure to the benefit of their successors and assigns, if any.

13. **TERMINATION**: This Agreement may be terminated by the Client upon at least 30 days prior written notice to JND. The Client's obligation to pay for services or projects in progress at the time of notice of withdrawal shall continue throughout the 30 day period. JND may terminate this Agreement (i) with 10 days prior written notice if the Client is not current in payment of charges or (ii) in any event, upon at least three months prior written notice to the Client. If Client terminates this Agreement, JND shall have no obligation to release any information or documentation related to the applicable matter until JND has been paid in full.